## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**DONALD MARSHALL BERLIN** and
**KIMBERLEY LAFARGE BERLIN, 21851,**
**Laurel Wood Court, Leesburg, VA 20175,**
**105 E Street SE, Washington, DC 20003,**

        **Plaintiffs,**

   **v.**

**BANK OF AMERICA, N.A., 100 North**
**Tryon Street, Charlotte, NC 28202,**

**VENTURES TRUST 2013 I-HR,**
**7500 Old Georgetown Rd., Ste. 1350**
**Bethesda, Maryland 20814,**

     <u>Serve</u>**: Wilmington Savings Fund**
          **Society, Inc.**
          **500 Delaware Ave., 11th Floor**
          **Wilmington, DC 19801**

   **and**

**MCM CAPITAL PARTNERS, LLC,**
**7201 Wisconsin Ave, Bethesda,**
**Maryland 20814-4810,**

     <u>Serve</u>**: Corporation Trust Company**
          **Corporation Trust Center**
          **1209 Orange Street**
          **Wilmington, DE 19801**

          **Defendants.**
_____/

**Civil Action No. 1:14-cv-01306-JEB**

## <u>FIRST AMENDED COMPLAINT</u>

      Plaintiffs Donald Marshall Berlin and Kimberley LaFarge Berlin, by and

through undersigned counsel, allege the following for their Complaint against Defendants

Bank of America, N.A. ("BANA"), Ventures Trust 2013 I-HR ("Ventures") and MCM Capital Partners ("MCM") (Ventures and MCM are together referred to as "Ventures" except where otherwise indicated):

## NATURE OF THE ACTION

1.      The facts of this case follow a very familiar narrative in the wake of the financial, banking and real estate collapse of the last few years, most particularly after 2009: following one of the worst economic periods in history, a bank abuses its long-standing relationship with its customers, refuses to deal fairly or consistently with said customers, forces the customers into uncontrolled and broken internal processes and systems, and acts in blatant disregard of its contractual duties, including its duty of good faith and fair dealing. Defendant Bank of America, N.A., successor by merger to BANA Home Loans Servicing, LP ("BANA" or "bank"), sacrificed a decade-old relationship with Plaintiffs Donald Marshall and Kimberley LaFarge Berlin (the "Berlins") through its misconduct from 2009 through the present. The seminal event occurred in April 2009, when Bank of America elected to essentially close the Premier Banking Center (the "PBC"), terminate all of its old-guard and experienced Private Bankers, and simply shut the PBC's doors without prior notice to the customers or any meaningful plan to assist them on their everyday banking needs or problems. The enticement of the PBC was to accord high net-worth customers a single point of contact, where all of its customer needs would be met and serviced through a dedicated team of professional bankers. When this group was dismissed, the single voice of contact for the Berlins was eliminated, making resolution of the most pedestrian of problems nearly impossible.

2.      In the years that followed, BANA acted in complete disregard for the Berlins by engaging in a pattern of misrepresentations, bad faith, and refusal to deal fairly and

effectively to resolve the issues underlying the Berlins' accounts. These acts of bad faith and breach of the covenant of fair dealing continue up to and during the present litigation before this Honorable Court, when BANA elected, following the filing of the present action, to sell its interest in the E Street Mortgage to Venture at what, based upon information and belief, is a significantly discounted rate, as opposed to offering to the Berlins the opportunity to simply settle this case by paying off the mortgage note at a fair and just rate.

3.       The agreements underlying this action all carry with them an implied covenant of good faith and fair dealing ensuring that parties to such contracts negotiate, perform, and enforce them in good faith. Under the law, a lack of good faith includes evasion of the spirit of the bargain, lack of diligence and slacking off, willful rendering of imperfect performance, abuse of power to specify terms, and interference with or failure to cooperate in the other party's performance. BANA, among other bad acts, breached its duty of good faith and fair dealing in several ways, including the following:

a.       BANA failed to fairly and effectively work with the Berlins to resolve the issues underlying their loans, where such issues were caused by BANA's own negligence or willful neglect.

b.       In violation of law and the contract documents, BANA drafted and recorded loan documentation and related materials with material and substantial defects, including incorrect amounts, incorrect party names, incorrect addresses, and other fatal defects, and then failed to timely correct its errors despite repeated requests and demands from the Berlins, and countless promises by BANA.

c.       BANA filed unsupported and wrongful foreclosure actions against the Berlins' properties.

d.       BANA promised to correct negative and misleading credit information it was furnishing regarding the Berlins. BANA made this promise in emails, by telephone calls, by faxes, by computer-generated letters, and by "personally signed override letters" executed by officers of the bank. All of the bank's promises were broken. BANA failed to remediate the Berlin's inaccurate and misleading credit information, claiming that its efforts were frustrated by its own software

(the "Bull's Eye Credit Reporting System"). BANA claims that each time one of its officers corrected the information BANA was furnishing regarding the Berlins, the Bulls Eye System would reverse the action within a short period of time thereafter. BANA also failed to conduct a reasonable investigation in response to notices of disputes forwarded to it by each of the three major credit bureaus.

e.     BANA dragged the negotiation/correction process on for five years, sending contradictory correspondence and other communications, making contradictory statements, failing to correct inaccuracies in the credit information it furnished regarding the Berlins, and failing to correct errors in the recorded documents. The Berlins incurred substantial costs and spent countless hours attempting in vain to obtain BANA's good faith compliance with the loan documents and applicable law.

f.     BANA misrepresented its intent to work with the Berlins while at the same time it continued to furnish inaccurate and misleading information to credit reporting agencies, threaten and/or file foreclosure actions, sent dozens of computer generated or nonresponsive communications, and retained or advised its third party agents (such as title companies and law firms) to pursue collection actions.

g.     Beginning in December 2013 through the current date, BANA knowingly sent to the Berlins letters and correspondence containing false and deceptive information, including, without limitation, that the Berlins sought modification of their loans through a federal program, that the Berlins sent BANA personal financial information to include personal and corporate tax returns and financial statements, and that the Berlins wanted to sell their properties. All of these claims that BANA made were not only false, but were deceptively so, and upon receipt of each correspondence, the Berlins advised BANA that it had never sought loan assistance, loan modification assistance, or assistance of any Bank or Federal sponsored modification program. Berlins further demanded BANA stop making these false claims, that the assistance was not only not sought by the Berlins, but moreover, they would not be eligible for such a program, and nor would these notes.

h.     During the period December 2013 through August 18th 2014, the Berlins further advised BANA that it was represented by counsel and sought to negotiate and settle the within claims, and invited BANA to participate in genuine, constructive and fruitful negotiations or discussions. Instead, BANA's response was to send numerous robotic letters and communications from a servicing center seeking to force the Berlins into their government mandated loan modification program as opposed to engage in legitimate communications.

i.     In contrast to BANA's bad faith, the Berlin's at all times acted in good faith. For example, the Berlins presented to the bank offers to pay down 100% of

their commercial loans, 100% of their personal and corporate credit cards, and 100% of the interest and principal of one mortgage (1051 Stuart Street). In exchange, the Berlin's obtained from BANA an agreement that it would fix incorrect loan origination documents, delete erroneous negative financial data from credit reporting agencies, and withdraw and delete foreclosure notices and/or filings that were mistakenly sent by BANA. It is now clear BANA never intended to keep these commitments and fraudulently induced the Berlins to pay over $1.2 million in return for empty promises.

j.  From December 2013 through the current date, the Berlin requested on at least 10 occasions that BANA provide them evidence that the allegedly corrected loan documents were corrected and recorded in the Official Recorder of Deeds for Loudoun County and the District of Columbia. BANA refused and failed to return proof that the modified loan origination documents had indeed been accepted by the Recorders. Likewise, the Berlins requested on many occasions that BANA provided copies of the modified loan origination documents that it had created but had not been accepted by Loudoun County or the District of Columbia. BANA refused.

4.  Upon information and belief, on or about September 26, 2014, BANA sold and/or transferred the loan associated with the 105 East Street Southeast, Washington, D.C. 2003 to Ventures with servicing by BSI Financial Services. BANA sold and/or transferred the loan without notice to the Berlins and without the Berlins' consent and even though this lawsuit was already filed against BANA by the Berlins related to this and other loans. Upon information and belief, Ventures, knew or should have known about BANA's bad faith, misrepresentations, and other wrongful conduct in BANA's dealings with the Berlins. Ventures certainly benefits from the Berlins' personal and business information and the hundreds of hours and thousands of dollars the Berlins' expended in trying to resolve the issues associated with their loans. Ventures is taking advantage of BANA's wrongful conduct in acquiring these loan documents and likely acquired them for far less than the Berlins offered BANA to resolve the claims underlying this matter.

FIRST AMENDED COMPLAINT—5

5.      Upon information and belief, Ventures acquired the loan documents believing that by their terms the instruments were overdue or that BANA alleged that there was an uncured default with respect to payment. As a result, Ventures is not a holder in due course, and it is subject to all the claims and defenses the Berlins may assert against BANA.

6.      Defendants must be held accountable for their actions, and this lawsuit seeks redress for their breach of contract, breach of the implied covenant of good faith and fair dealing, and misrepresentations. The Berlins seek money damages, an injunction requiring defendants to perform according to the agreements, rescission or reformation of the loans, and attorneys' fees and litigation expenses.

## PARTIES

7.      Plaintiffs Donald Marshall Berlin and Kimberley LaFarge Berlin are adult citizens of the Commonwealth of Virginia residing at 21851 Laurel Wood Court, Leesburg, Virginia 20175. The Berlins also own real property at 105 E Street SE, Washington DC 20003.

8.      Upon information and belief, Defendant Bank of America, N.A. is actively chartered by the FDIC as a National Bank (Certificate No. 3510; FDIC No. 480228) and is regulated by the Office of the Comptroller of the Currency (OCC). It is organized and existing pursuant to the laws of the State of Delaware and its principal place of business is located at 100 North Tryon Street, Charlotte, NC 28202. BANA maintains 5,292 domestic offices, including 28 in Washington D.C. and 170 in Virginia.

9.      Upon information and belief, Defendant Ventures Trust 2013 I-HR is a statutory trust organized and existing pursuant to the laws of the State of Delaware having

its principal place of business at 7500 Old Georgetown Rd., Ste. 1350, Bethesda, Maryland 20814.

10.     Upon information and belief, Defendant MCM Capital Partners, LLC is the trustee and legal representative of Defendant Ventures and is a corporation organized and existing pursuant to the laws of the State of Delaware having its principal place of business at 7201 Wisconsin Ave., Suite 725, Bethesda, Maryland 20814.

## JURISDICTION AND VENUE

11.     This Honorable Court has subject matter jurisdiction over the within action pursuant to 28 U.S.C. § 1331 because Plaintiffs' Fair Credit Reporting Act ("FCRA") claim arises under the laws of the United States, and/or pursuant to 28 U.S.C. § 1332 because the Plaintiffs and Defendants are citizens of different states and the amount in controversy exceeds the sum or value of $75,000.00.

12.     This Honorable Court has original or supplemental jurisdiction over Plaintiffs' state law claims.

13.     This Honorable Court has general and specific personal jurisdiction over BANA pursuant to D.C. Code §§ 13-422 and/or -423 based on its purposeful, continuous, and systematic contacts within the District of Columbia, and because Plaintiff's claims arise out of BANA's transaction of business in the District of Columbia.

14.     This Honorable Court has specific personal jurisdiction over Ventures and MCM pursuant to D.C. Code § 13-423 because the claims asserted herein arise out of those defendants' interest in real property located in the District of Columbia and/or transaction of business in the District of Columbia.

FIRST AMENDED COMPLAINT—7

15.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) because one of the subject properties is located, and a substantial part of the events giving rise to Plaintiff's claims occurred, in this district.

## FACTUAL ALLEGATIONS

### A.     Background of Lending Relationship

16.     The Berlins and Mr. Berlin's company, Investigative Consultants, Inc. ("ICI"), as well as other companies that he owns, for many years enjoyed an enduring and profitable relationship with Bank of America. The Berlins were valued customers in BANA's Private Banking and PBC and cultivated a strong business relationship with their private banker and primary contact at BANA. Over the years, the Berlins and ICI had several millions of dollars in assets, investments, loans, credit cards, and other kinds of accounts at BANA, which were all originated and maintained through BANA's PBC. The PBC was the primary point of contact for the Berlins.

17.     The lending relationship between BANA and the Berlins included multiple residential home mortgages and multiple home equity lines of credit ("HELOC"), including the following: Loan No. 872059109 ("Stuart Street Loan") for the purchase of the property located at 1051 North Stuart Street, Arlington, Virginia ("Stuart Street Property"); Loan No. 8707748344 ("E Street Loan") for the purchase of the property located at 105 E Street SE, Washington, DC 20003 ("E Street Property"); Loan No. 872408257 ("Laurel Wood Court Loan") for the purchase of the property located at 21851 Laurel Wood Court, Leesburg, Virginia 20175 ("Laurel Wood Court Property"); Loan No. 68511010223099 for renovation of the property owned by the Berlins ("HELOC 7799"); and Loan No. 68411001537799 for renovation of the property also owned by the Berlins ("HELOC 7799"). The Berlins also had

investment accounts, credit card accounts, as well as corporate and personal loans and lines of credit, all of which were originated at the PBC.

18.     Without notice to the Berlins, BANA abruptly closed its Premier Banking Centers in Washington D.C. and Bethesda, Maryland in or about April 2009. Upon information and belief, the bank terminated and/or reassigned the private bankers employed in the centers. This occurred against the background of federal and state investigation and litigation of BANA's internal processes, mortgage and foreclosure abuses, and other serious violations of federal and state law. Closing the PBC served BANA's own pecuniary interests at the expense of its clients, because the PBC was BANA's "bank within a bank" for high net worth customers. By closing the PBC and terminating the Berlins' access to their private banker, BANA left the Berlins without any point of contact who was knowledgeable about their accounts and loans.

19.     BANA forced the Berlins into its regular service and process channels, which proved wholly inefficient and ineffective. These processes (and the representatives assigned to assist the Berlins) were constantly changing and left the Berlins without an avenue to secure substantive responses to their questions and/or meaningful assistance with the issues surrounding their loans, costing the Berlins thousands of dollars and hundreds of hours of time and effort. BANA was wholly unequipped to deal with the sudden effect and consequence of massive investigations and internal problems. BANA was left with no effective means to service its high net worth customers, and it was extremely difficult (if not impossible) for the Berlins to unwind their relationships with BANA and/or move all of their loans and assets to different institutions.

20.     Beginning in the summer of 2009, the Berlins attempted to move their personal assets to a different financial institution. They undertook a good faith effort to negotiate with BANA through its convoluted processes to resolve the remaining issues on their loans. For example, the Berlins' loans with BANA all suffered from the same or similar problems originating from defective and incorrect documentation drafted by BANA and submitted to the Registers of Deeds in Loudoun County, Virginia, Arlington County, VA and the District of Columbia. These errors included incorrect names, misspelled names, incorrect address information and/or legal addresses.

21.     In January 2010, in reliance on assurances from BANA that the errors in the Berlins' loan documents and credit reports would be corrected, the Berlins' paid over $350,000 at the bank's request to pay a Commercial Line of Credit ($275,000) and a personal credit card ($75,000). In emails from the Berlins to BANA, it was Mr. Berlin's purpose to demonstrate to BANA his desire to act in good faith and receive the same in return from BANA. In exchange, BANA agreed to (a) correct inaccurate and misleading negative credit information which BANA had been furnishing to credit reporting agencies ("CRAs") that adversely impacted the Berlins' credit history and employment (which requires high level security clearances based on their work with the United States), and (b) correct the errors in the loan documents that permeated BANA's system.

22.     Upon information and belief, BANA breached its agreement to correct the Berlins' loan documents and credit reports. For example, on several occasions, the Berlins received from BANA computer generated or personally crafted letters on BANA stationary claiming that the corrections had been made, only to discover thereafter that BANA continue to provide the same inaccurate and misleading information to the CRAs. No sooner had the

FIRST AMENDED COMPLAINT—10

parties made progress in attempting to structure a settlement to include credit history remediation and removal of the loans from the foreclosure process and databases which report foreclosures, when another side of the bank (The Bull's Eye Credit Bureau Center) would nullify these efforts and send the parties back to the negotiation table to try and undo the damage caused by the bank's broken internal processes, all at considerable cost to the Berlins.

23.    Later, when BANA was notified by the CRAs of the disputed credit information, it failed to conduct a proper investigation as evidenced by its continued furnishing of the same inaccurate information.

24.    At the time BANA promised to correct inaccurate and misleading negative credit information it furnished to the CRAs, it knew or should have known it was unable to perform as promised.

25.    In early 2010, the Berlins tried to negotiate the satisfaction of the Stuart Street Loan with BANA:

   a.  The Stuart Street Loan documents contained numerous errors created by BANA. After repeated attempts to correct these problems, the Berlins advised BANA that if it did not correct the defects in the Stuart Street Loan, then the Berlins would be forced to move it to another bank. In or about February or March 2010, Wendy Powers of BANA's foreclosure group identified and located the original errant documents. Ms. Powers forwarded the loan file to the bank's Operations Management Group in Simi Valley, California where it was assigned to Amy Harp. On or about May 18, 2010, Ms. Harp discovered that all of the loans were implicated and admitted that some of the signatures on some of the documents were mistyped or miswritten at the time of closing.

   b.  Meanwhile, in March and April 2010, the Berlins continued to negotiate a resolution of the Stuart Street Loan with BANA. In the midst of these discussions, on or around April 20, 2010, BANA mistakenly and inappropriately gave notice of foreclosure and/or filed a foreclosure action against the Stuart Street Property. This forced the Berlins to incur additional costs and expenses in order to respond to the notice of alleged default and foreclosure pleadings. BANA later withdrew the action and

FIRST AMENDED COMPLAINT—11

attempted (unsuccessfully) to cease furnishing to CRAs inaccurate and misleading negative credit information related to this foreclosure.

c.   Nevertheless, in late April 2010, the Berlins reached an agreement with BANA regarding the Stuart Street Loan. The Berlins agreed to pay 100% of the principal and interest of the loan in exchange for the Bank's agreement to, among other things, forgive any and all late fees, costs, and legal fees, remediate any and all negative, derogatory, or adverse information associated with the Berlins' credit as a result of the Bank's misconduct, and remove any reference to the wrongful foreclosure action filed against the property and provide documentation supporting the Berlins' assertion that it was, in fact, wrongly filed. This was known as the so-called "Isidro Agreement," named after the bank officer who executed the agreement.

d.   The closing was set for April 28, 2010. BANA was responsible for sending the final closing figures and executed agreement on or before April 26, 2010. In fact, BANA had agreed to provide all necessary documentation and closing information to accomplish the closing and settlement by no later than April 26, 2010. Mr. Berlin reminded BANA in writing on many occasions to ensure the final paperwork was timely, and the Berlins repeatedly advised BANA that the closing needed to be completed by April 28, 2010.

e.   At significant expense, including legal and accounting fees, the Berlins attended the closing prepared to make the payment. However, BANA failed to timely send the closing figures and documentation. The closing had to be re-scheduled for the following day and all of the documentation had to be redone by counsel for the Berlins. The Berlins took unpaid days off to accommodate the bank, and Mr. Berlin was forced to cancel an Around the World United Airlines Global Services pass associated with travel for work.

f.   As stated, the parties entered into a release and settlement agreement at additional time and expense to the Berlins. The Berlins satisfied their obligations under the agreement and the Stuart Street loan was "paid in full." However, from April 2010 through July 20 2010, Mr. Berlin informed BANA representatives that they were in repeated violation of the agreement, as well as their written representations that BANA would correct the Berlins' credit reports. The Berlins spent hours and significant money contesting the credit reports, only to be told that BANA was claiming that the information regarding the Stuart Street Loan was correct. BANA repeatedly furnished inaccurate and misleading negative credit information regarding the Berlins to the CRAs.

g. Although BANA issued "override letters" and "final determination letters" in an attempt to stop furnishing erroneous and misleading information to the CRAs, the internal BANA credit reporting systems reversed these determinations and continued to furnish inaccurate and misleading negative credit information regarding the Berlins' loans. The Berlins sent the credit remediation letters and the Stuart Street Loan Agreement with BANA to the CRAs, which forwarded the dispute to BANA. In each case, BANA failed to conduct a proper investigation and continued to furnish inaccurate and misleading negative credit information to the CRAs.

h. In 2011, BANA was still attempting to reverse the "Bulls Eye Credit Bureau" system to correct information regarding the Berlins' loans, including the Stuart Street Loan.

i. Upon information and belief, BANA to this day reports the inaccurate and misleading "foreclosure" notification that was filed by BANA in April 2010, and it appears in the databases of companies that purchase information from various CRAs as well as other databases.

j. It should be noted that these events all served to cement the Berlins' insistence that all future agreements regarding the remaining loans, including the Laurel Wood Court Loan, E Street Loan and the HELOCs, had to be completed using a written settlement agreement. In fact, BANA accepted drafts of a Global Settlement Agreement for both the HELOCs and Laurel Wood Court Loan and E Street Loan and claimed that it was working toward resolving the outstanding issues and the final drafting of the agreement. The Berlins only later learned that BANA had no interest in entering into a settlement agreement concerning these loans and any such statements were meant to induce the Berlins to continue spending time and money negotiating.

26.    The Berlins also sought to resolve issues surrounding the HELOCs:

a. The Berlins entered into a HELOC agreement in order to perform renovations on the E Street Property. Unbeknownst to the Berlins, the HELOC loan documentation contained multiple errors. The property required significant rehabilitation and renovation in accordance with strict local and federal codes and regulations. The District of Columbia issued construction permits on the E Street property, which lies in the Historic Capitol Hill region. The construction permits used the legal address of the property as well as the correctly spelled names of the Berlins. During the course of rigorous permit and inspection proceedings in June and July of 2009, D.C. inspectors found that the official documents created by BANA and filed with the Recorder's Office in Washington D.C.

all contained incorrect information regarding the address, description, and ownership of the property. Officials demanded that the recorded documents conform to the billing address and legal description of the property, as well as the legal name of the owners. For a period of time, officials refused to "close out" the permits and licenses due to these BANA errors, and the Berlins could not obtain a legal occupancy permit in 2010 and 2011 for the E Street property as a result of BANA's errors.

b. Starting in March 2012, Mr. Berlin began communicating with BANA's legal counsel regarding the two HELOCs, seeking to pay the notes and enter into a settlement agreement to cover any pending issues. The Berlins knew from past experience that any settlement with BANA had to be in writing and required a legally enforceable contract and told BANA this on many occasions. BANA accepted this proposal and began drafting and discussing a Global Settlement Agreement that was similar to the Isidro Agreement. At the same time, the Berlins were also attempting to cooperate with the Department of Justice ("DOJ") and the Independent Review Commission ("IRC"), which were seeking information on all loans, including the HELOCs.

c. From March through August 2012, the Berlins wrote to BANA's counsel many times to obtain complete, accurate pay off amounts for the HELOCs and, with rare exception, were met with either (a) apologies for failing to answer because of either personal issues or technical problems with computers and voicemail at BANA, (b) no response at all, or (c) claims that the issue was resolved by way of a settlement, which BANA refused to confirm in writing. BANA also refused to provide any evidence that the HELOC notes were paid, in what amount, in what name, and involving which property.

d. In the midst of the negotiated settlement discussions between the Berlins and Mr. Allred regarding the HELOCs and the crafting of the Global Settlement Agreement in September 2012, BANA was ordered by federal regulators to write off all of the HELOC loans. This write off event occurred **after** the Berlins began cooperation with the IRC and the DOJ.

e. BANA never provided a correct (in terms of information in the HELOC), "paid in full" note for the HELOCs. Even at the point of being forced to write off this note, and after BANA redid all of the loan remediation and modification documents, the documents still contain errors, including an incorrect name, incorrect spelling of Mrs. Berlin's name, and the amount.

FIRST AMENDED COMPLAINT—14

27.     Unfortunately, this conduct is consistent with the Berlins' experience with BANA from 2009 through the present. At or around the time the parties negotiated the Stuart Street Loan Agreement, the Berlins and BANA agreed that the Berlins would segregate money and assets for the monthly payments owed to the bank under their other loan agreements, including the E Street Loan and Laurel Wood Court Loan, until the bank remediated the problems underlying those loans. At various times, the Berlins "balanced" the segregated funds against the amount BANA claimed was owed less any late fees, attorneys' fees or other costs. This was done when the Berlins would write to BANA and obtain the balance due for principal and interest and BANA would respond with the amount that should be maintained for its benefit. In other words, as evidence of the Berlins' good faith, they continued to make certain the funds were set aside for payments on the erroneous loan documents into an account set aside to pay the bank once the bank cured its mistakes. This method was repeatedly communicated to Cynthia Salazar, an Operations Management Consultants at BANA in Simi Valley, as well as her supervisor Amy Harp, and Ms. Salazar cooperated by emailing, from time to time, the "balanced" amount owed.

**B.     The E Street and Laurel Wood Court Loans**

28.     The two remaining unresolved loans between the parties are the E Street Loan and Laurel Wood Court Loan.

29.     On or about March 4, 2005, the Berlins entered into a promissory note and deed of trust in the original principal amount of $1,100,000 related to the Laurel Wood Court Property. The note and deed of trust, which were prepared by BANA, contained errors, including the spelling of Mrs. Berlin's name. The documents containing these errors were recorded in the Register of Deeds in Loudoun County, Virginia.

30.     On or about July 31, 2006, the Berlins entered into a promissory note and deed of trust in the original principal amount of $704,000 related to the E Street Property. The note and deed of trust, which were prepared by BANA, contained errors, including the spelling of Mrs. Berlin's name and the address of the property. The documents containing these errors were recorded in the Register of Deeds in the District of Columbia.

31.     BANA's failure to record accurate documents and it subsequent failures to correct the documents are in breach of its agreements with the Berlins.

32.     From April 2009 through the present, the Berlins repeatedly tried to negotiate a reasonable resolution to the problems associated with these loans. These negotiations span hundreds of emails and many different BANA representatives, each of whom was "reorganized" or "re-assigned" at varying times, over a five-year period. The Berlins worked diligently and negotiated in good faith but BANA refused to do the same.

33.     According to BANA, during the summer of 2009 and throughout all of 2010 and 2011, the bank conducted an internal management investigation and audit of the Berlin banking relationship. It was ordered by the Office of the President ("OOP") and the CEO of Bank of America and assigned to Amy Harp and Cynthia Salazar, who were Operations Management Consultants charged with the responsibility of investigating and solving internal, systemic problems of BANA's Home Loan Mortgage Group. This investigation sought to review the errors that had occurred during the service of the Berlin/BANA relationship and to try and identify the problems, determine the solutions, and implement those solutions.

34.     During this period, Ms. Salazar and others in her group in Simi Valley, CA, and the Berlins worked together in an effort to try and settle all disputes. This included

creating multiple corrected loan origination documents, correcting the inaccurate and mislead-ing negative credit history, facilitating and enabling the filing of the corrected loan origination documents, working with the credit reporting agencies to delete the inaccurate and misleading negative credit history, and canceling the foreclosure mistakes that had occurred because of BANA's broken processes. The Berlins cooperated with the investigation by providing hun-dreds of emails, telephone calls, telefaxes, and letters to the "OOP Group."  Upon information and belief, the OOP Group found numerous deficits, deficiencies, errors, mistakes, and prob-lems within the service centers of BANA that, in essence, substantiated the claims made by the Berlins to BANA. Upon information and belief, the OOP Group, on numerous occasions, directly or indirectly, caused "credit remediation letters" (in both computer generated form, as well as signed by officers of the bank) to be sent to the CRAs advising that the information BANA had furnished regarding the Berlins was inaccurate and misleading. OOP also issued what it called "suppression requests," attempting to force the Bull's Eye system to not report out inaccurate and misleading data regarding the loans in 2009, 2010 and 2011. Although the net effect was to suppress the bank's furnishing of inaccurate and misleading information for a short period of time, the negative data would always return, and so too would the mistaken foreclosure attempts.

35.     While the Berlins tried to modify, refinance, and pay their loans, and worked tirelessly to satisfy all of BANA's demands, BANA exhibited a pattern of negligence, bad faith, fraud, and other misconduct, and refused to deal fairly and effectively with the Ber-lins. BANA's misconduct includes:

      a.     From 2009 through late 2011, BANA prepared numerous loan modifi-cations in an attempt to correct the material and substantive errors in the Berlins' loan documents. BANA instructed the Berlins to review these

modifications and sign them for recording. Despite warnings from the Berlins that these documents still contained errors, BANA demanded that they be signed and returned. Upon information and belief, BANA attempted to record these modifications, only to have them rejected, returned, or wrongly filed by the Registers of Deeds in Virginia and D.C. because of the same or additional errors in the information included in the modifications and/or BANA's failure to pay the required recording fees or failure to properly notarize the documents. The documents had to be re-created again and again, each time going through additional review. Often times, previously cured errors in the documents (wrong names, wrong addresses, etc.) would re-surface, causing the same problems discussed above. The Berlins repeatedly notified BANA of the errors, but BANA ignored the Berlins' advice.

b.     On other occasions, upon information and belief, BANA would send the modified loan origination documents with a check to record the same but sent the wrong amount of money, resulting in the documents being returned again. This required BANA to recreate the modified documents, as they contained the wrong date. Every time new loan origination documents were prepared by BANA and sent to the Berlins for signature, the Berlins would expend legal, accounting, and other time and expense.

1.     Compounding these errors, BANA requested that each of the modifications be reviewed and signed and notarized by the Berlins and subsequently returned to the bank for filing. Each of these modifications had to be reviewed by counsel at the Berlins' expense. When mistakes were found, the Berlins repeatedly alerted BANA, but the bank ignored their requests to correct the errors. BANA sent the documents containing the errors to the Register of Deeds, who promptly rejected the documents and sent them back to BANA or recorded them with the incorrect information.

2.     The Berlins repeatedly complained to BANA about the errors and inconsistencies in these loans documents and attempted on multiple occasions to correct these errors. Upon information and belief, BANA's attempts to correct the errors in the loan documents and recorded loan documents were unsuccessful. The Berlins repeatedly requested that BANA obtain and provide a title report to show whether or not the errors were corrected.

3.     In November 2012, the Berlins elected to check the alleged filing and recording of the documents by obtaining a certified title

FIRST AMENDED COMPLAINT—18

search for the E Street Loan, using a federally insured bank (Revere Bank) as the ordering entity. The title search revealed that only Donald M. Berlin was listed as the owner on the "deed" or "deed in trust." Because the title report does not show both names on the title, the documents were found to be defective. The Berlins repeatedly requested that BANA run its own Title Report and compare it against the one that the Berlins received from Revere Bank and forwarded to BANA for their review.

4. The E Street Property is the legal address for certain licenses that Mr. Berlin is required to maintain. On October 31, 2012, Mr. Berlin was notified that his Private Detective License in the District of Columbia would not be renewed and he could not practice unless and until the E Street Property had an Occupancy Permit, at which point his investigative license could be renewed. Due to BANA's negligence and failure to cure the erroneous documents, Mr. Berlin was unable to obtain an Occupancy permit and therefore, his licenses at the correct location. He remains unlicensed today in Washington DC due to BANA's inexplicable inability to produce correct documents.

5. On or around February 5, 2013, the Berlins notified Melanie N. Morgan, working in the Office of the President at BANA, that the Title Report showed only Donald M. Berlin as the owner. The Berlins encouraged Ms. Morgan to obtain a certified title report for the Bank to determine the exact status and ownership of the property. Even though Ms. Morgan questioned the Berlins' title report, she refused to order one on behalf of the bank.

6. Despite repeated requests from the Berlins that BANA order a title report and/or provide evidence that the documents were corrected and properly filed, which requests were routinely denied, BANA's counsel did not inform the Berlins that a title report was actually run until December 2013. Although BANA now claims that all of the documents were corrected, on December 3, 2013 counsel for BANA stated that some of the incorrect items about which the Berlins had complained had not been changed and that counsel planned to submit for corrections. BANA refused to provide the alleged title report until March 2014.

7. Upon information and belief, in or about January 2014, BANA assigned the matter to outside counsel, Blank Rome, for independent review and to determine whether the loan documents

had been corrected as the bank had claimed. Blank Rome undertook this investigation and provided documents to the Berlins showing that the modifications were not done correctly and all of the earlier mistakes remained on the documents that Blank Rome provided to the Berlins. The Berlins notified BANA of the findings of BANA's own counsel, and provided them copies of these findings on at last 9 occasions from January 2014 through June 2014. BANA never responded to the Berlin's correspondence and, upon information and belief, failed to take any corrective action.

8.     Likewise, the Berlins communicated with BANA's counsel Blank Rome in writing on many occasions that its investigation had substantiated its claims that the documents that they, Blank Rome, had provided to the Berlins, and based upon information and belief, that Blank Rome had obtained from its client BANA, were defective. The Berlin's advised Blank Rome that indeed, their conclusion that the loan documents were "correct" was mistaken and requested that they redo their investigation because the very documents that Blank Rome had provided to the Berlin showed that the documents continued to be defective. Blank Rome nor BANA ever responded to any of these letters and remained silent.

9.

c.     BANA also sought to modify the loan documents on the Laurel Wood Court Loan. However, on several occasions, the documents were returned by the Register of Deeds. Similar to the E Street Loan, BANA would request that each of the modifications be reviewed and signed under oath by the Berlins and returned to the Bank for filing. When mistakes were found, the Berlins repeatedly alerted BANA, but the bank ignored their requests to correct the errors. BANA sent the documents containing the errors to the Register of Deeds, which were rejected by the Register of Deeds and sent back to the bank or recorded with the incorrect information created by the bank.

1.     For example, in April 2011, BANA requested that the Berlins execute modifications for the Laurel Wood Court Property and return the modification agreements. BANA failed to place the notary seal on the same page as the signatories. Mr. Berlin took the document to the Register of Deeds to determine whether it was suitable for filing. The representative at the Register's office rejected the document for three reasons: (1) the notary signature line and seal was not on the same page as the signatures, (2) the file that BANA sent to the Berlins and forwarded to the Register

of Deeds contained documents pertaining to the E Street Mortgage and was made a part of the Laurel Wood Court Filing, and (3) the Modification agreement for the Laurel Wood Court had the wrong legal address and/or description on the last page.

2. On April 8, 2011, BANA attempted another modification but again the notary signature line was omitted. The Register of Deeds again rejected the documents. The Berlins were caught in the middle with legal expenses mounting as BANA continued to send documents that were rejected by the Register of Deeds. Mr. Berlin communicated with BANA in July 2011 and advised of the problems. Despite this communication, the Bank sought to file the documents "as is." These documents were rejected by the Register's office.

3. In July, 2011, BANA sent another set of modifications concerning the Laurel Wood Court Property but these proposed modifications contained even more problems. The modification was back dated to April 2011, which the Register of Deeds indicated was improper. There were also misspellings in the document and BANA failed to include a place for a notary to sign.

4. In July and August 2011, Mr. Berlin reported the continuing problems and errors to Amy Harp and Cynthia Salazar at BANA.

5. Despite repeated requests from the Berlins that BANA order a title report and/or provide evidence that the documents were corrected and properly filed, BANA's counsel did not inform the Berlins that a title report was actually run until December 2013. Although BANA now claims that all of the documents were corrected, on December 3, 2013 counsel for BANA stated that some of the items about which the Berlins had complained had not been corrected and that counsel planned to submit for corrections. BANA refused to provide the alleged title report until March 2014.

6. Upon information and belief, in or about January 2014, BANA assigned the matter to Blank Rome for independent review and to determine whether indeed, the loan documents had been modified as the bank had claimed. Blank Rome undertook this investigation and provided documents to the Berlins showing that the modifications were never done correctly and all of the earlier mistakes remained on the documents that Blank Rome provided. The Berlins then sent the Blank Rome records to BANA seeking an explanation and response on at least eight occasions, and

FIRST AMENDED COMPLAINT—21

BANA refused to respond or did not respond substantively, but instead, sent "robo" created letters that contained false or materially false statements and claims, alleging that the Berlins were seeking financial assistance and loan modification.

d.    The errors and other deficiencies in the loan documents appeared on the Berlins' credit reports and negatively impacted their security clearance associated with their work for the United States. These issues caused months of delay and significant time and money spent reviewing and attempting to correct the documents. At one point, the Berlins even offered to hire local counsel and consultants in D.C. to prepare the modifications on behalf of the bank to correct the errors and personally file the documents and pay the proper fees. BANA refused this offer and continued to knowingly and intentionally prepare and file defective documents in violation of law and breach of the loan agreements.

e.    In or about late 2009 or early 2010, BANA incorrectly assessed late charges against the Berlins on the Laurel Wood Court Loan. The Berlins deducted these alleged late penalties from subsequent payments because there was no basis for the penalties. BANA rejected the Berlins' payments, asserting that the amounts were less than what was due, and then assessed more late charges.

f.    In or about late 2009 or early 2010, BANA sent bills related to the E Street Loan to the wrong address, and, despite the Berlins' efforts to correct this error on at least seven occasions by providing the correct address to the bank, the bank continued to use the wrong address, causing the bills to be delayed or lost.

g.    On multiple occasions BANA filed or caused to be filed wrongful foreclosure actions against the Berlins' properties. These foreclosure actions were based in part on documents created by BANA containing material and substantial errors. BANA subsequently retracted each of these inappropriate foreclosure actions, admitting that they should not have been filed. BANA's misconduct in each of these wrongful foreclosures cost the Berlins a significant amount of time and money defending and investigating these claims.

i.    For example, on or about January 17, 2012 the Bank served the Berlins with a foreclosure (one in a long line of wrongful foreclosure actions) concerning the Laurel Wood Court property. This came as a complete surprise to the Berlins, who were negotiating in good faith with BANA regarding this property and who relied on BANA's representations that it would not pursue collection

efforts against the Laurel Wood Court Loan during these negoti-
ations. Ms. Salazar on behalf of BANA moved to withdraw the
action, admitting it should not have been filed.

ii.      BANA continued to threaten foreclosure actions against the un-
derlying properties from 2012 through late 2013, even as the Ber-
lins and their counsel negotiated a good faith resolution to these
issues and after BANA represented that it would put a hold on
any such correspondences.

iii.     BANA repeatedly failed to cure and/or notify the Register of
Deeds and/or credit reporting agencies that BANA's foreclosure
actions against the Berlins' properties were wrongfully filed.
Upon information and belief, these foreclosure actions still ap-
pear in commercial eviction and foreclosure databases that pick
up data from credit bureaus, recorder of deeds, etc., which con-
tinues to affect the Berlins' credit report/history and security
clearances.

h.     BANA repeatedly agreed in 2009, 2010 and 2011 not to furnish negative,
derogatory, and/or adverse information to credit reporting agencies
while it attempted to correct the errors related to the Berlins' loans. Con-
trary to these statements, BANA furnished, and continues to furnish,
inaccurate and misleading negative information to the credit reporting
agencies. BANA failed to correct inaccurate and misleading negative, de-
rogatory, and/or adverse information furnished to the credit reporting
agencies regarding all loans, including the Laurel Wood Court and E
Street Loans.

1.     BANA repeatedly issued signed correction and remediation
credit letters, to include a "Final Determination Letter" by Cyn-
thia Salazar, Angelica Lara, and others in 2010 and 2011 directing
the credit bureaus to remove the negative information. But each
of these letters were later overridden by BANA's own broken
internal processes, which prevented anyone from suppressing the
Bull's Eye Credit Bureau system from subsequently furnishing
inaccurate and misleading negative information about the Berlins.

2.     The Berlins obtained a credit report on or about June 14, 2013
that shows BANA continues to furnish inaccurate and misleading
negative and derogatory data to CRAs, such as TransUnion
Credit Services, LLC. The history shows that while the inaccurate
and misleading information may, at times, be absent or deleted
for one or two cycles, these corrections are never permanent.

    i.      BANA employed a process driven system that inhibited any form of meaningful communications with BANA. For example:

1.    From April 2009 through the present, BANA representatives with whom the Berlins were forced to work often failed to respond to the Berlins' reasonable requests for status updates or information. There would often be long delays without a response from Salazar, Grant Allred, Melanie Morgan, and/or any of the other almost 30 BANA representatives who were assigned to the Berlins file and/or portions of the file.

2.    The Berlins' matter has been assigned to numerous different account specialists in the Office of the President and others in the Home Loan Group in California, the Home Retention Group in Texas, the Office of the CEO and President, and other unknown third-party processors. This included around 30 different representatives from BANA from 2009 through the present. The primary people included Cynthia Salazar, Amy Harp, and Amy Moore.

3.    After June 2012, BANA assigned Thomas Allred and Thomas McMahon to deal with the Berlins' HELOCS, which they did with little or no success. From November 2012 through December 2012, the Berlins were instructed to work with Melanie Morgan.

4.    After dozens of communications from Mr. Berlin to Morgan, she stated in December 2012 that her office was being re-organized and the loans would no longer be reviewed. She also indicated, without explanation, that she was no longer assigned to the case. Morgan also stated that the Berlins will have 30 days to pay or the loans will be foreclosed upon and that BANA did not wish to settle.

5.    In early 2013, BANA informed the Berlins that Veronica Yektafar would handle the matter. Mr. Berlin contacted Yektafar and requested that they confer regarding settlement of these matters. He invited her to engage with him by phone, letter, email or any other method on at least 7 occasions because he was directed and instructed to do so by the Office of the President at BANA. Mr. Berlin received absolutely no response to his communications.

6.    In April 2013, Mr. Berlin was told that his new contact at BANA was Robert Solinas. The fax number BANA provided for Solinas

did not work and Solinas refused to communicate via email, citing bank policy that allegedly prohibits use of email.

j.      BANA engaged in long delays in providing even the most basic loan information including a payoff letter, the underlying loan documents, any attempts at modification, and deeds or deeds in trust. For example, from December 2013 through May 2014, the Berlins requested this basic loan information from BANA. It was not provided until May 28, 2014 and, when the information was provided, it was incomplete.

k.      From 2009 through 2014, on at least twelve occasions, the Berlins requested copies of real estate taxes paid by BANA, as well as interest received from the Berlins, so that the Berlins could file accurate state and federal tax returns. BANA failed to provide this information.

l.      BANA employees, agents, or representatives repeatedly trespassed onto the Berlins' properties in 2012 and 2013, including E Street and Laurel Wood Court properties. At times, these individuals jumped a fence in order to trespass on the property and post a notice on the front door.

m.      On behalf of BANA, third parties contacted the Berlins on several occasions, threatening collection actions against the Berlins. These communications occurred despite promises from BANA officers, such as Ms. Salazar, Mr. Allred, and BANA's in-house counsel, that these communications would stop and knowing that the Berlins were represented by counsel.

   1.      For example, from January through May 2012, the Berlins received several letters from ReconTrust indicating that it was authorized by BANA to accelerate the debt and threatening foreclosure or other collection action. BANA (including Salazar) admitted these letters should not have been sent.

   2.      In or about late July and early August 2013, the Berlins received around a dozen calls from Long & Foster Realtors (namely, Thomas Cole) in Silver Spring, Maryland regarding a short sale of the Berlins' E Street Property. Cole indicated that via telephone and a short sale authorization form on BANA letterhead that he (and Long & Foster) was an agent or representative of BANA. Cole stated that he was assigned by BANA to affect a "short sale" on the property and to immediately "move the tenants or owners" so that it could be shown and sold. Mr. Berlin asked for documentation authorizing Cole to conduct the short sale or allow it to occur, but Cole stated that in order to obtain that information, one has to apply for and accept the offer being extended by

BANA. Cole stated that files are generated by BANA and sent to him via Federal Express and then the documentation is approved directly by BANA as the client. The Berlins never authorized or requested such contact.

3.  As yet another example of BANA's bad faith, in or about October 2013, the Berlins received correspondence from the Wittstadt Title & Escrow Company and Morris/Hardwick/Schneider law firm stating that BANA referred the matter to them in order to collect the debt. In November 2013, the Berlins were contacted by attorneys at the law firm Morris, Hardwick, Schneider, 22375 Broderick Drive, Suite 210, Dulles, VA 20166. These attorneys claimed to be counsel for BANA and claimed to be pursuing collection and/or litigation related to the E Street and Laurel Wood Court Loans. The outside counsel indicated that they were not aware the Berlins were working with BANA to try to resolve any outstanding issues and forwarded the information to BANA "in an effort to get everyone on the same page regarding the status of the negotiations and their effect on any foreclosure proceedings." In-house counsel for BANA stated that no outside counsel had contacted the Berlins. This statement was false.

n.  In late 2013 and early 2014, BANA continued to send threats of foreclosure and notices of default despite promises from BANA that these communications would cease while the parties engaged in negotiations to resolve the underlying issues. The computer generated letters and threats the Berlins received should have been suppressed, according to representations from BANA's employees and in-house counsel.

o.  Throughout this period from 2009 through at least January 2014, the Berlins received regular "robo calls" from BANA, including (at times) up to a dozen calls in one day and at all times of the day and night. The Berlins repeatedly requested BANA put a stop to the robo calls and BANA repeatedly promised to do so, but the calls continued.

p.  BANA continued to attempt to communicate directly with the Plaintiffs even after both parties were known to be represented by counsel and BANA had been requested to cease direct communications.

q.  BANA was unable to provide consistent, uninterrupted, and non-reversed accurate credit reporting regarding the Berlins to the three major CRAs. The Berlins repeatedly notified BANA about this issue.

36.     These examples illustrate BANA's refusal to deal fairly and effectively with the Berlins. For at least the last five years, the bank engaged in countless acts of bad faith, fraud, and other misconduct related to the Berlins' loans. This pattern continues today. From December 2013 through June 2014, BANA continued to send computer generated and/or non-responsive correspondence (namely from Edward Dixon or Susie Soria) by way of answering the Berlins' requests for information and materials. These letters misstate that the Berlins sought federal financial assistance and/or assistance under the loan remedial help program. The letters also state the Berlins would like to sell their property, which is not true. The Berlins never indicated a desire to sell their property or requested BANA "evaluate the borrowers for a short sale or deed in lieu of foreclosure." The letters also state that there are no loan modification documents associated with the Laurel Wood Court Loan or E Street Loan and, as a result, BANA cannot fulfill the Berlins' request for this information. This statement is also false. By these actions, BANA breached its duties of good faith and fair dealing.

37.     Mr. Dixon or persons, systems, or processes at his direction caused to be repeatedly sent to the Berlins requests for tax returns, financial information, profit and loss statements, and other personal data so that he could "process their application for loan remediation," knowing that the Berlin never sought nor authorized involvement in this program. To the contrary, the Berlins repeatedly advised Mr. Dixon that they did not seek this assistance, was represented by counsel, and to stop seeking to "corral [them] into the loan remediation program that they did not seek and for which they did not qualify."

38.     Upon information and belief, after the Berlins filed this action against BANA, the bank sold and/or transferred the E Street Loan and related documents to Ventures. BANA did so without notifying the Berlins before the sale and/or seeking the Berlins'

authorization to do so. BANA is not (and never was) interested in fairly and effectively nego-

tiating with the Berlins and/or dealing with them in good faith as it relates to the E Street and

Laurel Wood Court Loans.

       39.     Upon information and belief, Ventures and MCM knew or should have

known about (and Ventures benefitted from) BANA's bad faith, misrepresentations, and other

wrongful conduct its dealings with the Berlins. Upon information and belief, Ventures ac-

quired the loan documents believing that by their terms the instruments were overdue or that

BANA alleged that there was an uncured default with respect to payment. As a result, Ventures

is not a holder in due course, and it is subject to all the claims and defenses the Berlins may

assert against BANA.

    **C.**    **BANA's Misconduct as it Relates to the Berlins Follows a Familiar Pat-
tern Given the Recent Disclosures by the U.S. Department of Justice and
Department of Housing and Urban Development.**

       40.     This matter is at the core of the current loan crisis in the United States.

Bank of America's conduct during the five-year debacle that characterizes its relationship with

the Berlins since 2009 is not surprising given the recent exposure by the federal government

of BANA's incompetence in the foreclosure and claims process.

       41.     A recent federal investigation by the U.S. Department of Housing and

Urban Development, Office of Inspector General ("HUD"), and Department of Justice

("DOJ") confirmed that Bank of America, Chase, Wells Fargo Bank, CitiMortgage, and Ally

Financial, Inc., engaged in widespread questionable (if not illegal) foreclosure practices involving the use of foreclosure "mills" and a practice known as "robosigning"[1] of sworn documents in thousands of foreclosures throughout the United States.

42.     On February 9, 2012, the DOJ and 49 State attorneys general announced their proposed settlement of $25 billion with Bank of America and the four other mortgage servicers for their reported violations of foreclosure requirements. As part of the proposed settlement agreement, each of the five servicers will pay a portion of its settlement to the United States and must undertake certain consumer relief activities.

43.     On March 12, 2012, HUD released some of its findings in Memorandum No. 2012-FW-1802, which summarized the department's review of Bank of America's foreclosure and claims process. DOJ used this review and analysis in negotiating the settlement agreement with Bank of America and the four other mortgage servicers described above. The report concludes that "***Bank of America did not establish effective control over its foreclosure process***." (Emphasis added.) This failure permitted a "control environment" in which:

- Affiants routinely signed foreclosure documents, including affidavits, certifying that they had personal knowledge of the facts when they did not.  Specifically, affiants signed foreclosure documents without reviewing the supporting or source documentation reference in them.   They also consistently failed to verify the accuracy of the foreclosure documents they signed.

- Notaries public routinely notarized documents without witnessing affiant signatures.  They also failed to maintain required records of the documents they notarized.

---

[1] The term "robosigning" refers to the practice of an employee or agent of the servicer signing documents automatically without performing a due diligence review or verification of the facts.

> • It may have allowed attorneys to improperly prepare documents and misrepresent the work they performed.
>
> (Id.)

44.     According to this Report, "[t]his flawed control environment resulted in Bank of America filing improper legal documents, thereby misrepresenting its claims to HUD and may have exposed it to liability under the False Claims Act."

45.     The report also reveals:

> Bank of America failed to follow HUD requirements for properties it foreclosed upon in judicial foreclosure States and jurisdictions.  These provisions required Bank of America to obtain and convey to the Secretary of HUD good and marketable title to properties.  Bank of America may have conveyed flawed or improper titles to HUD because it did not establish a control environment which ensured that affiants performed a due diligence review of the facts submitted to courts and that employees property notarized documents.
>
> (Id. at 5-6.)

46.     HUD concluded that "Bank of America had no effective quality assurance function[,]" and that "Bank of America's foreclosure process during the review period did not ensure that it properly executed foreclosure documents before submitting them to courts or ensure that it conveyed good and marketable title to HUD." The Department also concluded that legal documents were not consistently maintained, affidavits contained inconsistencies and errors, and the bank conveyed a property with an incorrect legal description. This is precisely the sort of misconduct at the heart of the Berlins' Complaint.

47.     According to recent news reports, BANA has been assessed billions for its role in the mortgage crisis.

48.     This lack of control and failure to ensure the integrity of the foreclosure and modification process is entirely consistent with the Berlins' experience in this case. It is as though HUD was specifically reporting on the Berlins' relationship with Bank of America, as they suffered (and continue to suffer) many of the same problems outlined in HUD's report. The misconduct alleged herein stems in large part from BANA's negligent and willful acts and omissions, not from any failures on the part of the Berlins. BANA either purposefully or recklessly developed a system designed to inhibit the Berlins' good faith negotiation with the bank.

**D.      Ventures and MCM are Liable for the Acts and Omissions of BANA with respect to the E Street Loan.**

49.     According to documentation forwarded on behalf of Ventures and BANA, on September 26, 2014 Ventures purchased Loan No. 8707748344, the E Street Loan.

50.     Upon information and belief, prior to purchasing the E Street Loan from BANA, Ventures and MCM had actual or constructive notice of the allegations set forth in the original complaint (Dkt. 1) and of each unlawful act or omission of BANA.

51.     Ventures is not a "holder in due course" and is subject to the same claims Plaintiffs may assert against BANA.

52.     Upon information and belief, prior to Ventures' purchase of the E Street loan from BANA, MCM had actual or constructive notice of each and every allegation set forth in the original complaint and each unlawful act or omission of BANA.

53.     MCM is Ventures' legal representative and is properly before this Honorable Court.

**First Claim for Relief:**
**Declaratory Judgment**

54.   Plaintiffs incorporate by reference the preceding paragraphs of this pleading as if set forth herein.

55.   Pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201-02 (the "Act"), Plaintiffs seek a judgment declaring that the loan agreements and related documents between plaintiffs, on the one hand, and BANA and Ventures, on the other hand, are null and void and that Plaintiffs are discharged from any and all liability under these agreements. The Court should declare these agreements null and void based on BANA's and Ventures' bad faith and other misconduct described above.

56.   An actual controversy exists between Plaintiffs and Defendants.

57.   BANA and Ventures have taken the position that it they are the rightful holders of Plaintiffs' loans and that all such documents are legally valid and enforceable.

58.   Plaintiffs' interests, on the one hand, and BANA's and Ventures' interests, on the other hand, are adverse to each other.

59.   Plaintiffs have a legally protectable interest in the controversy and are directly affected by the enforceability and validity of the loans.

60.   The controversy is ripe for judicial determination.

61.   Based on the foregoing, an actual and justiciable controversy exists with respect to, among other issues, BANA's and Ventures' ability to enforce the agreements by and between the bank and Plaintiffs.

## Second Claim for Relief
### Breach of Contract

62.     Plaintiffs incorporate by reference the preceding paragraphs of this pleading as if set forth herein.

63.     Each of the E Street and Laurel Wood Court Loan documents is a valid and enforceable contract between the Plaintiffs and the Defendant. Each of the agreements between the Plaintiffs and the Defendant pursuant to which the Defendant agreed to stop furnishing inaccurate and misleading negative credit information concerning the Plaintiffs is a valid and enforceable contract. Each of the agreements between the Plaintiffs and the Defendant pursuant to which the Defendant agreed to cure any deficiencies in the loan documents is a valid and enforceable contract.

64.     Plaintiffs have performed all of their obligations pursuant to the contracts.

65.     As set forth herein, Defendant has failed to perform its obligations pursuant to the contracts.

66.     Defendant's breaches of these contracts are substantial and material.

67.     The damages suffered by Plaintiffs due to Defendants' breaches of these contracts were foreseeable to Defendant at the time Defendant entered into the contracts.

68.     As a direct and proximate result of Defendants' breaches of the contracts, Plaintiffs have suffered, and will continue to suffer, damages.

69.     Ventures acquired the E Street Loan knowing that BANA alleged that there was an uncured default and/or believing that the instruments were overdue. As a result,

Ventures is not a holder in due course, and it is subject to the same claims as those Plaintiffs may assert against BANA.

**Third Claim for Relief:**
**Breach of the Implied Covenant of Good Faith and Fair Dealing**

70.    Plaintiffs incorporate by reference the preceding paragraphs of this pleading as if set forth herein.

71.    Plaintiffs and BANA entered into contractual relationships with each other wherein an implied covenant of good faith and fair dealing was incorporated as a term as a matter of law.

72.    BANA, through the conduct described herein, failed to exercise good faith in the performance, enforcement, or carrying out of the terms of one or more of its contracts with Plaintiffs.

73.    Through its conduct, BANA failed to endeavor to accomplish the objectives of the contracts in violation of relevant law. BANA breached the duty of good faith and fair dealing implied in every contract under the law.

74.    Plaintiffs suffered damages as a result of BANA's breach of the implied covenant of good faith and fair dealing.

75.    Ventures acquired the E Street Loan knowing that BANA alleged that there was an uncured default and/or believing that the instruments were overdue. As a result, Ventures is not a holder in due course, and it is subject to the same claims as those Plaintiffs may assert against BANA.

76.    By selling the E Street Loan note to Ventures during the pendency of this litigation, and, upon information and belief, at a substantial discount, BANA is attempting

to increase the Berlins' litigation costs and frustrate the Berlins' attempts to obtain BANA's compliance with the loan documents and District of Columbia law.

77.     At their election, Plaintiffs seek damages or rescission of the loan transactions between BANA (and with respect to the E Street Loan, Ventures as BANA's successor and holder not in due course of the E Street Loan) and them.

### Fourth Claim for Relief:
### Fraudulent Misrepresentation

78.     Plaintiffs incorporate by reference the preceding paragraphs of this pleading as if set forth herein.

79.     As alleged with specificity in the Amended Complaint, BANA knowingly made statements (and omissions) of fact regarding, among other things, its intent and ability to properly record the loan documents, its intent and ability to remediate and/or correct the Berlins' credit history and the recorded loan documents and intent to negotiate and resolve the issues underlying plaintiffs' loans.  The date, place, content, and individuals involved in those representations and omissions are alleged above.

80.     With respect to each such true statement alleged to have been omitted or concealed by BANA, it owed plaintiffs a duty to disclose the truth of such omitted or concealed fact. A relationship of trust existed between BANA, on the one hand, and plaintiffs, on the other hand.

81.     BANA's statements and omissions were untrue.

82.     BANA made the representations and omissions alleged herein knowing the misrepresentations and omissions were untrue or recklessly without caring whether they were true or false.

FIRST AMENDED COMPLAINT—35

83.     BANA made these false statements and omissions with the intent to defraud and deceive plaintiffs and for the purpose of inducing plaintiffs to act upon the false states and omissions to plaintiffs' pecuniary damages.

84.     Plaintiffs believed the false statements made to them, or believed that no facts existed inconsistent with BANA's omissions and concealments, and reasonably acted in reliance upon those beliefs to their detriment.

85.     As a result of their detrimental reliance on BANA's fraudulent statements and omissions, plaintiffs have suffered damages.

86.     Ventures acquired the E Street Loan knowing that BANA alleged that there was an uncured default and/or believing that the instruments were overdue. As a result, Ventures is not a holder in due course, and it is subject to the same claims as those Plaintiffs may assert against BANA.

87.     At their election, plaintiffs seek damages or rescission of the loan transactions between plaintiffs and BANA (and, with respect to the E Street Loan, Ventures as BANA's successor and holder not in due course of the E Street Loan).

**Fifth Claim for Relief:**
**Negligent Misrepresentation**

88.     Plaintiffs incorporate by reference the preceding paragraphs of this pleading as if set forth herein.

89.     As alleged with specificity in the Complaint, BANA knowingly made statements (and omissions) of fact regarding, among other things, its intent and ability to properly record and loan documents, its intent and ability to remediate and/or correct the Berlins' credit history and the recorded loan documents and intent to negotiate and resolve

the issues underlying plaintiffs' loans. The date, place, content, and individuals involved in those representations and omissions are alleged above.

90.    With respect to each such true statement alleged to have been omitted or concealed by BANA, it owed plaintiffs a duty to disclose the truth of such omitted or concealed fact. A relationship of trust existed between BANA, on the one hand, and plaintiffs, on the other hand.

91.    BANA's statements and omissions were untrue.

92.    BANA was negligent and failed to exercise ordinary care in making these representations and omissions to plaintiffs.

93.    Plaintiffs believed BANA's false statements and omissions to be true and relied on them.

94.    BANA's misrepresentations and omissions caused plaintiffs to suffer damages.

95.    Ventures acquired the E Street Loan knowing that BANA alleged that there was an uncured default and/or believing that the instruments were overdue. As a result, Ventures is not a holder in due course, and it is subject to the same claims as those Plaintiffs may assert against BANA.

96.    At their election, plaintiffs seek damages or rescission of the loan transactions between plaintiffs and BANA (and, with respect to the E Street Loan, Ventures as BANA's successor and holder not in due course of the E Street Loan).

**Sixth Claim for Relief**
**Violation of the Fair Credit Reporting Act**

97.     Plaintiffs incorporate by reference the preceding paragraphs of this pleading as if set forth herein.

98.     BANA is a furnisher of information as that term is used in 15 U.S.C. § 1681s-2(b).

99.     BANA knew or should have known it was reporting false information regarding the Berlins.

100.    Upon information and belief, in response to notices received from the CRAs, BANA violated 15 U.S.C. § 1681s-2(b) by:

a.      Failing to conduct a reasonable investigation with respect to the disputed information,

b.      Failing to review all relevant information provided by the CRAs,

c.      Failing to report the results of its investigation to the CRAs,

d.      Failing to conduct a searching inquiry into Plaintiffs notice of dispute,

e.      Failing to review all relevant information provided to it by the CRAs,

f.      Failing to verify all of the information provided by the CRAs;

g.      Failing to modify or permanently block the reporting of inaccurate information regarding Plaintiffs,

h.      Failing to note on its subsequent reports to the CRAs that Plaintiffs disputed the information reported, and

        i.       Otherwise acting in violation of 15 U.S.C. § 1681s-2(b).

101.    Plaintiffs infer from BANA's subsequent failure to correct the information it furnished to the CRAs that BANA failed to conduct a reasonable investigation in response to the Bureaus' notices.

102.    BANA's failure to conduct a reasonable investigation in response to the Bureaus' notices violated 15 U.S.C. § 1681s-2(b).

103.    BANA's failure to correct the inherent problems in the Bulls Eye system, which rendered compliance with FCRA impossible, represents a separate and continuing violation of FCRA.

104.    Each time BANA received a notice of dispute from a CRA and failed to conduct a reasonable investigation in response thereto constitutes a new violation of FCRA.

105.    BANA's violations of FCRA were and are willful and knowing.

106.    BANA's violations of FCRA are continuing.

107.    As a direct and proximate result of BANA's violations of FCRA, Plaintiffs have suffered and will continue to suffer damages.

108.    Ventures acquired the E Street Loan knowing that BANA alleged that there was an uncured default and/or believing that the instruments were overdue. As a result, Ventures is not a holder in due course, and it is subject to the same claims as those Plaintiffs may assert against BANA.

### Seventh Claim for Relief
### <u>Promissory Estoppel</u>

109.    Plaintiffs incorporate by reference the preceding paragraphs of this pleading as if set forth herein.

110.    As discussed herein, BANA promised to correct all of the errors in the loan documents, correct inaccurate and misleading information it had furnished to the CRAs, and cease reporting inaccurate and misleading information to the CRAs.

111.    BANA made these promises with the intent that Plaintiffs would rely on them.

112.    Plaintiffs did rely on these promises to their detriment, by, among other things, making payments to BANA and engaging counsel to represent them before the bank.

113.    BANA failed to perform as promised.

114.    As a direct and proximate result of BANA's failure to perform as promised, Plaintiffs have suffered and will continue to suffer damages.

115.    Ventures acquired the E Street Loan knowing that BANA alleged that there was an uncured default and/or believing that the instruments were overdue. As a result, Ventures is not a holder in due course, and it is subject to the same claims as those Plaintiffs may assert against BANA.

**WHEREFORE**, Plaintiffs Donald and Kimberley Berlin demand judgment as follows:

A.    A declaration that the loan agreements and related documents between plaintiffs, on the one hand, and BANA and Ventures, on the other hand, are null and void and that Plaintiffs are discharged from any and all liability under these agreements;

B.    An order enjoining BANA and Ventures to correct the inaccurate and misleading information furnished to the CRAs regarding the Berlins and to cease furnishing inaccurate and misleading information to the CRAs.

C.      An award of actual damages and penalties in an amount to be proven at trial, but which exceeds $100,000.00.

D.      An award of exemplary damages, costs, disbursements, expenses, and attorneys' fees otherwise allowed by law; and

E.      Such other and further relief as this Honorable Court deems proper.

**PLAINTIFFS DEMAND A TRIAL BY JURY**

December 3, 2014                        **OSTER LAW FIRM**

Steven M. Oster
1850 M. Street N.W., Suite 280
Washington, D.C. 20036
Tel. (202) 596-5291
Fax: (202) 747-5862
steve@osterlawfirm.com

*Counsel to Plaintiffs Donald and Kimberley Berlin*

FIRST AMENDED COMPLAINT—41