## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

DONALD MARSHALL BERLIN, *et al*.,

Plaintiffs,

v.

BANK OF AMERICA, N.A.,

Defendant.

Civil Action No.  14-1306 (JEB)

## MEMORANDUM OPINION

Plaintiffs Donald and Kimberley Berlin bring this suit alleging that they suffered a

nightmarish ordeal when trying to wrap up their affairs with Defendant Bank of America, N.A.

According to the Berlins, they had enjoyed a long and positive relationship with the Bank until it

closed its Premier Banking Centers for high-net-worth individuals such as themselves.  At that

point, they were forced into the Bank's regular service channels, and when they sought to wind

down their various accounts, the Bank's incompetence or bad faith made doing so nearly

impossible.  For one thing, Plaintiffs discovered that the Bank had prepared and recorded their

loan documents with numerous errors.  As they attempted to resolve those issues, the Bank filed

wrongful foreclosure actions against their properties and reported negative and inaccurate credit

information regarding their accounts.  Although Defendant admitted that these actions were

taken in error and repeatedly agreed to fix its mistakes, it continually failed to do so.  Indeed,

according to Plaintiffs, BANA still furnishes inaccurate credit information and still has not

corrected defects in certain of their loan documents.  Their experience was made all the more

frustrating by the flood of robo-calls, notices of default, debt-collection notices, and other

communications that the Berlins received and that the Bank repeatedly promised would stop but

1

did not.  The Berlins' security clearances and Mr. Berlin's professional license were also

adversely affected as a direct result of BANA's actions.

Finally at their wits' end, they filed this suit alleging violations of the Fair Credit

Reporting Act, 15 U.S.C. § 1681 *et seq.*, and various state-law torts.  Defendant now moves to

dismiss all seven counts, raising a congeries of different arguments.  As a few gain traction, the

Court will grant the Motion in part, but deny it in the main.

## I.        Background

Distilling the central allegations in Plaintiffs' Amended Complaint is no easy task.  They

filed a 41-page, mostly single-spaced pleading that is often heavy on detail yet light on clarity.

The Court understands that the Berlins may be frustrated; assuming that the facts alleged are true

– as it must at this stage – they endured an infuriating experience as a result of Bank of

America's pure incompetence or bad faith.  Future pleadings and briefs must, however, provide a

clearer picture of the chronology and arrangements that are central to their claims, and they must

more specifically link particular actions to the corresponding counts.  With that counsel, the

Court will now lay out the key facts insofar as it is able to discern them.

For many years, the Berlins "enjoyed an enduring and profitable relationship" with Bank

of America.  See Am. Compl., ¶ 16.  Indeed, Plaintiffs and companies that Mr. Berlin owned

"had several millions of dollars in assets, investments, loans, credit cards, and other kinds of

accounts at BANA."  Id.  The "lending relationship" involved, among other things, "multiple

residential home mortgages and multiple home equity lines of credit" for several properties

located in D.C. and Virginia.  Id., ¶ 17.  But the relationship between Plaintiffs and the Bank

eventually soured.

According to the Berlins, the "seminal event" took place in April 2009, when BANA closed its Premier Banking Centers.  See id., ¶ 1.  The PBCs had given the Bank's "high net-worth customers a single point of contact, where all of its customer needs would be met and serviced through a dedicated team of professional bankers."  Id.  When BANA terminated the PBCs "[w]ithout notice to the Berlins," id., ¶ 18, it "forced [them] into its regular service and process channels."  Id., ¶ 19.  These "proved wholly inefficient and ineffective" for resolving numerous problems that arose with respect to their loans, and made it "extremely difficult (if not impossible) for [them] to unwind their relationships with BANA and . . . move all of their loans and assets to different institutions."  Id.

For instance, in early 2010, they sought to "negotiate the satisfaction" of a loan related to property at 1051 North Stuart Street in Arlington, Virginia.  See id., ¶¶ 17, 25.  As it turns out, the original loan documents "contained numerous errors."  Id., ¶ 25(a).  Plaintiffs thus attempted to remedy the defects with the Bank.  In the course of working out a resolution, however, the Bank compounded their problems by "mistakenly and inappropriately [giving] notice of foreclosure and/or fil[ing] a foreclosure action" against the property.  Id., ¶ 25(b).  While it subsequently withdrew the action, it continued to report negative credit information to consumer-reporting agencies (CRAs) about the foreclosure.  See id.

The parties nonetheless managed to come to an agreement in late April 2010, under which the Berlins would pay off the loan in full and, in exchange, the Bank would "forgive any and all late fees, costs, and legal fees, remediate any and all negative, derogatory, or adverse information associated with [their] credit as a result of the Bank's misconduct, and remove any reference to the wrongful foreclosure action filed against the property and provide documentation supporting [their] assertion that it was, in fact, wrongly filed."  Id., ¶ 25(c).  Of

course, like all of the Berlins' dealings with the Bank during this period, finalizing this agreement was not without problems.  BANA, for example, was supposed to "send[] the final closing figures and executed agreement" at least two days in advance of the scheduled closing date of April 28, 2010.  Id., ¶ 25(d).  It was reminded of this "in writing" and "on many occasions," id., but it did not send the documents in time.  See id., ¶ 25(e).  The parties, consequently, had to reschedule the closing, and the Berlins had to have their own counsel draw up the final documents.  See id.  Because of the Bank's lack of follow through, finalizing this agreement was done at considerable "additional time and expense to the Berlins."  Id., ¶ 25(f).

Unfortunately, Plaintiffs' efforts to finalize the deal were also for naught.  While they satisfied their half of the bargain to pay off the remainder of the loan, the Bank was in "repeated violation" of the agreement and its "written representations that [it] would correct [their] credit reports."  Id.  Any steps that BANA did take to correct the information proved futile.  According to Plaintiffs, "Although BANA issued 'override letters' and 'final determination letters,' in an attempt to stop furnishing erroneous and misleading information to the CRAs, the internal BANA credit reporting systems reversed these determinations and continued to furnish inaccurate and misleading negative credit information."  Id., ¶ 25(g).  When Plaintiffs informed the CRAs about the inaccurate information, and the CRAs then notified BANA of the disputes, the Bank still "failed to conduct a proper investigation and [it] continued to furnish inaccurate and misleading negative credit information to the CRAs."  Id.  In fact, it is the Berlins' belief that BANA continues to convey erroneous credit information to the CRAs about the foreclosure action filed against the Stuart Street property, and that this false information is also still maintained in various databases that obtain information from CRAs.  See id., ¶ 25(i).

The headaches only continued with Plaintiffs' attempts to resolve their home-equity lines of credit (HELOCs).  The documentation for one such loan, which they had taken out to make legally required renovations on one of their properties, "contained multiple errors."  Id., ¶ 26(a).  "During the course of rigorous permit and inspection proceedings" related to the renovations, "D.C. inspectors found that the official documents created by BANA and filed with the Recorder's Office in Washington D.C. all contained incorrect information regarding the address, description, and ownership of the property."  Id.  Because of these defects, "officials refused to 'close out' the [construction] permits and licenses," and "the Berlins could not obtain a legal occupancy permit in 2010 and 2011."  Id.

In March 2012, Plaintiffs and BANA representatives discussed the possibility of a settlement agreement under which the Berlins would pay off the notes on their two home-equity loans in exchange for resolving "any pending issues" on the loans.  Id., ¶ 26(b).  The Bank's representatives "accepted this proposal and began drafting and discussing a Global Settlement Agreement" similar to the one the parties negotiated for the Stuart Street loan.  Id.  Despite the apparent agreement, however, the Bank was extremely unresponsive in its dealings with Plaintiffs.  For several months, the Berlins made numerous attempts to "obtain complete, accurate pay off amounts" for these loans but "with rare exception, were met with either (a) apologies for failing to answer . . . , (b) no response at all, or (c) claims that the issue was resolved by way of a settlement."  Id., ¶ 26(c).  Defendant, however, refused to provide written confirmation that the claims had been resolved or any documentation showing the amount that Plaintiffs had paid on the notes.  See id.  Luckily for the Berlins, in September 2012, federal regulators ordered the Bank to write off these loans – although they still have not received an accurate "paid in full" note.  See id., ¶ 26(d)-(e).

Their troubles, regrettably, did not end there.  They suffered similar ordeals with respect to two other loans that, to this day, remain unresolved.  The first, entered into in March 2005, was for the purchase of property located at 21851 Laurel Wood Court in Leesburg, Virginia.  See id., ¶¶ 17, 29.  The second, executed in July 2006, was for the purchase of property located at 105 E Street SE in Washington.  See id., ¶¶ 17, 30.  The documents related to both contained errors, but were, nevertheless, recorded with the respective Registers of Deeds in Virginia and D.C.  See id., ¶¶ 29, 30.

According to Plaintiffs, the Bank's "failure to record accurate documents and it [*sic*] subsequent failures to correct the documents are in breach of its agreements with [them]."  Id., ¶ 31.  Since April 2009, they have tried again and again to have the Bank fix its mistakes, but to little avail.  See id., ¶ 32.  For instance, "[f]rom 2009 through late 2011, BANA prepared numerous loan modifications in an attempt to correct the material and substantive errors in the Berlins' loan documents."  Id., ¶ 35(a).  "Despite warnings from [Plaintiffs] that these documents still contained errors, BANA demanded that they be signed and returned."  Id.  Based on these errors, the Registers of Deeds rejected the documents or recorded them, yet again, with mistakes.  See id.  The parties, consequently, had to go through numerous iterations of revising the documents, see id., and the Berlins had to "expend legal, accounting, and other time and expense" with each new version.  See id., ¶ 35(b).  Despite all of this, the Bank has still not corrected these documents.  See, e.g., ¶ 35(b)(7)-(8).

The Bank's alleged conduct over the years would have driven any sane person up the wall.  It filed multiple wrongful foreclosure actions against Plaintiffs' properties, based in part on erroneous documents that it had prepared.  See id., ¶ 35(g).  Although it "subsequently retracted each of these inappropriate foreclosure actions, admitting that they should not have been filed,"

these actions "cost the Berlins a significant amount of time and money defending and investigating the[] claims."  Id.  The Bank also reported inaccurate and misleading negative credit information to CRAs about these foreclosures, and its attempts to cease providing such information were ineffectual, largely because its own software repeatedly overrode prior attempts to correct the information.  See id., ¶¶ 25(b), 35(g)(iii).  As if that were not enough,  the Bank "continued to threaten foreclosure actions against the underlying properties . . . even as the Berlins and their counsel negotiated a good faith resolution to these issues and [even] after BANA represented that it would put a hold on any such correspondences."  Id., ¶ 35(g)(ii).

Resolving these issues was made all the more difficult by the Bank's "process driven system that inhibited any form of meaningful communications."  Id., ¶ 35(i).  Plaintiffs often did not receive responses to their "reasonable requests for status updates," see, e.g., id., ¶ 35(i)(1), and had to deal with "long delays" when seeking to obtain "even the most basic loan information."  Id., ¶ 35(j).  They received notices from third parties "threatening collection actions" despite the Bank's assurances that such communications would stop, see id., ¶ 35(m), and they were inundated with "robo calls" even after BANA said there would be no more.  See id., ¶ 35(o).  The Bank, additionally, sent "computer generated and/or non-responsive correspondence" in response to their "requests for information and materials."  Id., ¶ 36.  These communications stated, among other things, that the Berlins were seeking to sell their properties, to be evaluated for short sales, and to obtain help from the Bank's remedial help program when they were not.  Id., ¶¶ 36, 37.

In addition to the sheer frustration that they had to endure, Plaintiffs sustained a variety of injuries as a result of BANA's conduct.  "The errors and other deficiencies in the loan documents," for instance, "appeared on the Berlins' credit reports and negatively impacted their

security clearance[s] associated with their work for the United States." Id., ¶ 35(d).  Mr. Berlin

was also unable to renew one of his professional licenses due to the errors.  Specifically, he used

their E Street property as the legal address for his D.C. Private Detective License.  See id., ¶

35(b)(4).  In October 2012, he was told that he could not renew it until the E Street property had

an occupancy permit.  See id.  Because of the defects in the loan documents, however, he and his

wife were unable – and, in fact, remain unable – to secure an occupancy permit for the property.

See id.  As a result, he still has not obtained a renewed license.  See id.

      Having finally grown tired of their fruitless attempts to resolve these issues, the Berlins

filed this suit on July 31, 2014.  They assert several claims in their Amended Complaint,

including that BANA: breached the contracts that it had formed with them; breached the

covenants of good faith and fair dealing implied in each of those contracts; made fraudulent

and/or negligent misrepresentations in its dealings; violated the Fair Credit Reporting Act; and is

bound by principles of promissory estoppel.  Plaintiffs seek a host of remedies including

invalidation of the remaining loan agreements on the E Street and Laurel Wood Court properties,

an injunction compelling the Bank to correct the negative credit information, an award of money

damages, and attorney fees and costs.  Defendant now moves to dismiss the Amended Complaint

on the ground that it fails to state a claim for relief.

**II.      Legal Standard**

      Under Federal Rule of Civil Procedure 12(b)(6), the Court must dismiss a claim for relief

when the complaint "fail[s] to state a claim upon which relief can be granted."  In evaluating a

motion to dismiss, the Court must "treat the complaint's factual allegations as true and must

grant plaintiff the benefit of all inferences that can be derived from the facts alleged."  Sparrow

v. United Air Lines, Inc., 216 F.3d 1111, 1113 (D.C. Cir. 2000) (citation and internal quotation

marks omitted); see also Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).  A court need not accept as true, however, "a legal conclusion couched as a factual allegation," nor an inference unsupported by the facts set forth in the complaint.  Trudeau v. FTC, 456 F.3d 178, 193 (D.C. Cir. 2006) (quoting Papasan v. Allain, 478 U.S. 265, 286 (1986)).  Although "detailed factual allegations" are not necessary to withstand a Rule 12(b)(6) motion, Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007), "a complaint must contain sufficient factual matter, [if] accepted as true, to state a claim to relief that is plausible on its face."  Iqbal, 556 U.S. at 678 (internal quotation omitted).  A plaintiff may survive a Rule 12(b)(6) motion even if "recovery is very remote and unlikely," but the facts alleged in the complaint "must be enough to raise a right to relief above the speculative level."  Twombly, 550 U.S. at 555-56 (quoting Scheuer v. Rhodes, 416 U.S. 232, 236 (1974)).

## III.    Analysis

The Berlins' Amended Complaint includes seven counts, which the Court will address in turn.  Before doing so, it notes that BANA's Motion did not address which jurisdiction's law should govern the Court's analysis of Plaintiffs' common-law claims.  In their Opposition, Plaintiffs asserted that claims related to the E Street property are governed by District of Columbia law, and those related to the Laurel Wood Court property are controlled by Virginia law.  See Opp. at 8.  They did not, however, indicate which law should apply to claims arising out of the Stuart Street loan agreement, the HELOCs, or the parties' subsequent settlement agreements.  BANA again failed to address the issue in its Reply, though it did insert a handful of citations to Virginia cases.  Without the benefit of the parties' addressing the issue, the Court reserves judgment on which law governs the various agreements and analyzes the claims, where appropriate, under the laws of both jurisdictions.

A.  Count I: Declaratory Judgment

Plaintiffs' first count is styled as a claim for "declaratory judgment."  See Am. Compl.,

¶¶ 54-61.  In it, the Berlins seek a declaration under the Declaratory Judgment Act, 28 U.S.C. §§

2201-02, that their "loan agreements . . . are null and void and that [they] are discharged from

any and all liability."  Id., ¶ 55.  As Defendant rightly points out, however, that Act does not

provide a stand-alone cause of action; it, instead, authorizes a form of relief.  See Ali v.

Rumsfeld, 649 F.3d 762, 778 (D.C. Cir. 2011); see also, e.g., Smirnov v. Clinton, 806 F. Supp.

2d 1, 11 (D.D.C. 2011) ("The Declaratory Judgment Act . . . is not 'an independent source of

federal jurisdiction'[;] . . . [r]ather, the statute merely creates a remedy in cases otherwise within

the Court's jurisdiction.") (quoting C & E Servs., Inc. of Wash. v. D.C. Water & Sewer Auth.,

310 F.3d 197, 201 (D.C. Cir. 2002)).  To the extent Plaintiffs seek to assert a cause of action for

"declaratory judgment," it is dismissed.  They may, however, retain it as a form of requested

relief.  BANA's further assertion that such relief is unwarranted here, see Mot. at 4-5, is

premature.

B.  Count II: Breach of Contract

Plaintiffs' second count alleges that BANA breached the E Street and Laurel Wood Court

loan agreements, as well as numerous other written and oral contracts under which the Bank had

agreed to correct the deficient loan documents and to cease providing inaccurate information to

credit agencies.  See Am. Compl., ¶¶ 62-68.  Defendant's Motion raises myriad challenges to the

sufficiency of these claims.  The Court, thankfully, need not address each of the asserted bases

for Plaintiffs' breach-of-contract count, which are rather difficult to tease apart, because as long

as they have stated a claim in relation to one of their purported contracts, the count may remain.

It is clear that they have made out such a claim for BANA's failure to remedy mistakes in their

loan documents in accordance with the parties' agreements that it would do so in return for Plaintiffs' paying off certain loans.

The elements of a breach-of-contract claim are virtually the same under D.C. and Virginia law.  In the District, "a party must establish (1) a valid contract between the parties; (2) an obligation or duty arising out of the contract; (3) a breach of that duty; and (4) damages caused by breach."  Brown v. Sessoms, 774 F.3d 1016, 1024 (D.C. Cir. 2014) (quoting Tsintolas Realty Co. v. Mendez, 984 A.2d 181, 187 (D.C. 2009)) (internal quotation marks omitted). Virginia similarly requires "(1) a legally enforceable obligation of a defendant to a plaintiff; (2) the defendant's violation or breach of that obligation; and (3) injury or damage to the plaintiff caused by the breach of obligation."  Filak v. Geroge, 594 S.E.2d 610, 614 (Va. 2004).  The requirements for a valid contract are also largely the same – namely, there must be an offer and acceptance related to lawful subject matter and consideration.  See, e.g., Window Specialists, Inc. v. Forney Enterprises, Inc., 26 F. Supp. 3d 52, 57 (D.D.C. 2014) (Under D.C. law, "[t]he essential elements of a contract are 'competent parties, lawful subject matter, legal consideration, mutuality of assent and mutuality of obligation.") (quoting Henke v. U.S. Dep't of Commerce, 83 F.3d 1445, 1450 (D.C. Cir. 1996)); Montagna v. Holiday Inns, Inc., 269 S.E.2d 838, 844 (Va. 1980) (contract elements under Virginia law are "acceptance of an offer as well as valuable consideration") (internal citation omitted).

Again, the Court confines its analysis for now to the parties' later agreements under which BANA was to correct errors in the Berlins' loan documents, fix negative credit information it had reported about their accounts, and take other corrective actions in return for Plaintiffs' paying off certain loans in full and early.  Defendant has raised several challenges to the viability of this claim, including that: (1) the later agreements are not valid contracts because

they lacked adequate consideration; (2) those later agreements are also unenforceable because they were not written down and therefore run afoul of the statute of frauds; (3) BANA's performance under the contracts was excused under the prior-material-breach doctrine; (4) the assertion of a breach-of-contract count is undermined by Plaintiffs' promissory-estoppel claim; and (5) this count, insofar as it relates to credit reporting, is preempted by the FCRA.  The Court deals with these *seriatim*.

### 1.  *Adequate Consideration*

Defendant first stresses that the later contracts fail for lack of consideration.  <u>See</u> Mot. at 6.  On this point, it argues that Plaintiffs' alleged half of the bargain was to pay off certain of their debts, and that paying off existing obligations cannot serve as "new or adequate consideration."  <u>Id.</u>

The D.C. Court of Appeals has explained that, "[f]or a contract to be enforceable, each party must undertake to 'do something [the] party otherwise is under no legal obligation to do, or to refrain from doing something [the] party has a legal right to do . . . .'"  <u>Eastbanc, Inc. v. Georgetown Park Associates II, L.P.</u>, 940 A.2d 996, 1003 (D.C. 2008) (quoting <u>Order of AHEPA v. Travel Consultants, Inc.</u>, 367 A.2d 119, 125 (D.C. 1976)); <u>see also</u> <u>Rinck v. Ass'n of Reserve City Bankers</u>, 676 A.2d 12, 15-16 (D.C. 1996).  Where the parties seek to modify an existing contract, moreover, they may do so, but "[i]n order to be valid, . . . the modification must possess the same elements of consideration as necessary for normal contract formation."  <u>Rinck</u>, 676 A.2d at 17 (internal quotation marks and citation omitted).  If one party to the bargain merely fulfills its previous obligations, there is inadequate consideration to support the modification.

In the present case, the Amended Complaint adequately alleges that there was mutual consideration for the later contracts. Specifically, the Berlins promised to pay off certain loans in full before they were due in exchange for the Bank's promising to, *inter alia*, correct the mistakes in the loan documents. Although somewhat murky, Defendant seems to concede in its Reply that paying off a loan before it is due can constitute new and adequate consideration. It nonetheless emphasizes that the Amended Complaint only alleges that Plaintiffs paid off the loans, not that they did so on an accelerated basis. The Bank argues that it was not until their Opposition brief that Plaintiffs indicated that they had made the payments before they were due, and the Berlins "cannot save their inadequately plead breach of contract claim through Monday-morning quarterbacking." Reply at 4-5. The Court, however, believes that a reasonable inference to be drawn from their allegations is that they agreed to pay off certain loans before they were legally obligated to do so. See, e.g., Am. Compl., ¶¶ 3(i), 21. As a result, the later contracts were supported by adequate consideration. See Ponder v. Chase Home Finance, LLC, 865 F. Supp. 2d 13, 18-19 (D.D.C. 2012) (finding plaintiff adequately pled existence of valid contract where bank was to "cease foreclosure proceedings and accept payments on a certain schedule in exchange for [the plaintiff's] making those payments and providing certain documentation").

2. *Statute of Frauds*

Moving on, BANA contends that Plaintiffs cannot enforce these later contracts because of the statute of frauds. D.C.'s statute provides, in pertinent part, that "[a]n action may not be brought . . . upon a contract or sale of real estate, [or] of any interest in or concerning it, . . . unless the agreement upon which the action is brought, or a memorandum or note thereof, is in writing, . . . signed by the party to be charged therewith or a person authorized by him." D.C.

Code § 28-3502.  As the D.C. Court of Appeals has explained, the "statute of frauds mandates that certain agreements, including those concerning real estate, must be in writing to guard against perjury and protect against unfounded and fraudulent claims." Railan v. Katyal, 766 A.2d 998, 1007 (D.C. 2001) (internal quotation marks and citation omitted).[1]  Defendant contends that all of the alleged contracts relate to mortgaging land and thus fall within the statute's scope.  See Opp. at 7, Reply at 5-6.  Although their position is not altogether clear, Plaintiffs appear to dispute this assertion.  See Opp. at 13.  The Court need not decide the issue now, however, because even if all of the contracts "concern real estate," the statute of frauds does not clearly bar the Berlins' recovery.

To begin, the statute of frauds is an affirmative defense.  See Cox v. Elwing, 432 A.2d 736, 737 (D.C. 1981); Paley v. Estate of Ogus, 20 F. Supp. 2d 83, 90 n.7 (D.D.C. 1998); see also Fed. R. Civ. P. 8(c)(1).  The burden of establishing it, therefore, lies with a defendant.  See Paley, 20 F. Supp. 2d at 90 n.7 (citing Green v. Dist. of Columbia Dep't of Employment Servs., 499 A.2d 870, 877 n.7 (D.C. 1985)).  This also means that the Berlins were not required to plead facts in their Amended Complaint to defeat such a defense.  See id.  Courts will only dismiss a complaint on such basis if it is apparent from the face of the pleading that a plaintiff will be unable to succeed.  This is not the case here.  Although their Opposition seems to suggest that the later contracts were "oral agreements," see Opp. at 13, and although many of the paragraphs they cite do not seem to support their contention that those agreements were "memorialized" in writing, see, e.g., Am. Compl., ¶ 34 (referencing "hundreds of emails, telephone calls, telefaxes, and letters" but providing no indication of what was contained in those communications), the

---

[1] As noted previously, the Bank did not engage in any discussion regarding which state's law the Court should apply to Plaintiffs' common-law claims.  It ignored this issue entirely and relied almost exclusively on District law.  Because it is not the Court's job to research affirmative defenses for the Bank, the Court addresses the viability of BANA's statute-of-frauds defense only under District law.

Court believes that the Amended Complaint nonetheless allows the inference that there are notes and memoranda reflecting the parties' agreements that could satisfy the statute.

Importantly, "the Statute does not require that the 'contract' itself be in writing or that the signature of the party to be charged be affixed to the writing as the operative, legally effective act of assent." Farrow v. Cahill, 663 F.2d 201, 208-09 (D.C. Cir. 1980). Rather, it requires only that the contract "be evidenced by a 'memorandum or note thereof . . . signed by the party to be charged therewith or a person authorized by him.'" Id. at 209. "Generally, the purpose for which a memorandum was prepared and the intent with which it was signed are simply immaterial to determining whether the Statute has been satisfied." Id. The key element is that "it embod[y] the terms of the contract" and indicate the existence of the contract. Id. at 208. For instance, it "is satisfied even by a letter which purports to repudiate or cancel an otherwise valid oral agreement, or which refuses to enter a written contract after an oral agreement was reached." Id. at 209.

The Amended Complaint states that "on several occasions" the Berlins "received . . . computer generated or personally crafted letters on BANA stationary claiming that the corrections had been made." Am. Compl., ¶ 22. Should these letters sufficiently acknowledge the existence of the parties' agreement and its essential terms, Plaintiffs could satisfy the statute of frauds. The Amended Complaint additionally alleges that "[f]rom April 2009 through the present, the Berlins repeatedly tried to negotiate a reasonable resolution to the problems associated with these loans," and that "[t]hese negotiations span hundreds of emails." Id., ¶ 32. Such emails may be sufficient if, for instance, they establish BANA's offer to remedy the problems in exchange for the Berlins' paying off certain loans. See, e.g., Farrow, 663 F.2d at 209.

Even if there are no writings evidencing the parties' agreements, moreover, the Berlins may still be able to show that the purported contracts fall within an exception to the statute. Under District of Columbia law, "courts may refuse to allow [a] defendant to interpose a statute of frauds defense even if it is properly raised . . . where the equitable doctrine of part performance [is] applicable (promissory estoppel)." Hackney v. Morelite Const., 418 A.2d 1062, 1066 (D.C. 1980) (internal quotation marks and citation omitted); see also Railan, 766 A.2d at 1007-08; R & A, Inc. v. Kozy Korner, Inc., 672 A.2d 1062, 1067 n.8 (D.C. 1996). That is, "[o]ral agreements are exempt from the operation of the statute of frauds where a party's part performance shows unequivocal evidence of the alleged agreement, or where the plaintiff has justifiably relied on the oral agreement to her detriment." Zanders v. Reid, 980 A.2d 1096, 1102 (D.C. 2009) (internal quotation marks and citation omitted). "In order to effectively assert estoppel, the promisee must be able to show that he has changed his position substantially for the worse and that he has incurred unjust and unconscionable injury." Landow v. Georgetown-Inland West Corp., 454 A.2d 310, 314 (D.C. 1982) (citation omitted); see also, e.g., Gharib v. Wolf, 518 F. Supp. 2d 50, 55 (D.D.C. 2007). Plaintiffs, for their part, allege that they fully performed their half of the bargains, and that they took a variety of other steps – to their detriment – as a result of the parties' agreement. As such, if the later agreements do fall within the statute of frauds, this may prove to be another avenue for them to overcome it.

### 3.  *Prior-Material-Breach Doctrine*

Defendant's suggestion that the breach-of-contract claim must fail under the prior-material-breach doctrine is also unavailing. Under that doctrine, "a party may defend against a breach of contract claim on the ground that its performance was excused by the other party's prior breach of the contract." United States v. Kellogg Brown & Root Servs., Inc., 856 F. Supp.

2d 176, 185 (D.D.C. 2012) (citing Long Island Savings Bank, FSB v. United States, 503 F.3d

1234, 1251 (Fed. Cir. 2007)); see also Ashcraft & Gerel v. Coady, 244 F.3d 948, 950 (D.C. Cir.

2001) (noting that, "[a]s a general proposition, we take no issue with the rule in the Restatement"

under which "a party's continuing obligations under a contract are conditioned on there being no

'uncured material failure by the other party to render any such performance due at an earlier

time'") (quoting Restatement (Second) of Contracts, § 237).

      The Court need not explore the availability or contours of this doctrine at this time,

however, because the Amended Complaint does not state that the Berlins materially breached the

loan agreements or any of the other subsequent agreements before BANA did.  Indeed,

Defendant only stated in its Motion that "[t]o the extent that Plaintiffs failed to make payment,

this constituted a breach of the loan documents" and "excused any performance by BANA under

the contract," without providing citations to any paragraphs in the Amended Complaint that it

believes show that the Berlins did not make payments pursuant to their contracts.  See Mot. at 7.

And at least with respect to the later agreements, Plaintiffs affirmatively indicated that they fully

satisfied their obligations.  See, e.g., Am. Compl., ¶ 21 (alleging that "the Berlins paid over

$350,000" in accordance with the parties' agreement).  The Court, accordingly, declines to

dismiss the Count on this basis.

                    4.  *Consistency with Promissory-Estoppel Claim*

      The Bank next argues that the Berlins' assertion of a breach-of-contract claim is

"inconsistent" with their promissory-estoppel count.  As discussed in greater depth *infra*, the

latter cause of action permits a plaintiff to recover in the absence of a valid contract.  See Vila v.

Inter-American Investment, Corp., 570 F.3d 274, 280 (D.C. Cir. 2009).  Where an enforceable

contract does exist, courts typically do not allow plaintiffs to bring claims for promissory

estoppel; instead, they must recover under the terms of the contract.  See id.  In this way, there is a tension between the claims.

It is clear, however, that at this stage of the proceedings, Plaintiffs may pursue these alternative theories.  The case of Plesha v. Ferguson, 725 F. Supp. 2d 106 (D.D.C. 2010) – on which Defendant relies – does not suggest otherwise.  There, the district court dismissed a plaintiff's promissory-estoppel claim because an express contract governed the parties' relationship.  In doing so, the court emphasized that the defendants did not dispute the existence of a written contract that governed the relevant events.  See id. at 111-12.  Here, as the preceding discussion makes clear, BANA hotly contests the validity of the purported contracts pursuant to which it was to remedy the loan-documentation errors, the inaccurate credit information, and other matters.  Because it is not yet clear which side will prevail on the issue of whether the later agreement was a valid contract, Plaintiffs must be allowed to proceed with both claims.

### 5.   *FCRA Preemption*

Finally, in its Reply, BANA raises a new rationale for dismissal – *viz.*, "to the extent Plaintiffs' claim for breach of contract relates to 'furnishing inaccurate and misleading negative credit information,' [their] claim is preempted by the Fair Credit Reporting Act."  Reply at 5 (quoting Am. Compl., ¶ 63).  "[I]t is a well-settled prudential doctrine that courts generally will not entertain new arguments first raised in a reply brief."  Aleutian Pribilof Islands Ass'n, Inc. v. Kempthorne, 537 F. Supp. 2d 1, 12 n.5 (D.D.C. 2008) (citing Herbert v. National Academy of Sciences, 974 F.2d 192, 196 (D.C. Cir. 1992)).  The reasons for doing so are largely "pragmatic."  Herbert, 974 F.2d at 196.  "To consider an argument discussed for the first time in reply would be manifestly unfair" to the other litigant who does not typically have an opportunity to respond, and "would risk the possibility of an improvident or ill-advised opinion, given [the court's]

18

dependence as an Article III court on the adversarial process for sharpening the issues for decision." Id. (internal quotation marks and citation omitted). Although Plaintiffs in this case were permitted to file a Sur-Reply, the Court nonetheless feels that it is best to delay a decision on this particular issue until it can be briefed more fully.

For one thing, this argument would not warrant dismissal of the claim in its entirety anyway. The Bank's alleged breaches include conduct aside from furnishing and failing to correct inaccurate credit information – e.g., the Bank's failure to correct errors in the loan documents that were recorded.

This question, moreover, is one not so easily resolved. The relevant preemption provision provides – with exceptions not applicable here – that "[n]o requirement or prohibition may be imposed under the laws of any State . . . with respect to any subject matter regulated under . . . section 1681s-2 of this title, relating to the responsibilities of persons who furnish information to consumer reporting agencies . . . ." 15 U.S.C. § 1681t(b)(1)(F). On first blush, this might seem to preempt all state-law claims, including breach-of-contract claims. Yet, as Plaintiffs point out, a plurality of the Supreme Court has held with respect to a similarly worded preemption provision in another federal statute that "a contractual commitment voluntarily undertaken should not be regarded as a 'requirement . . . imposed under state law.'" Cipollone v. Liggett Grp. Inc., 505 U.S. 504, 526 (1992). Several courts, moreover, have relied on Cipollone to find that breach-of-contract and related claims are not preempted by the FCRA. See, e.g., Pachecano v. JPMorgan Chase Bank Nat. Ass'n, No. 11-805, 2013 WL 4520530, at *7 (W.D. Tex. Aug. 26, 2013) (breach-of-contract claim not preempted because it involves "an obligation imposed by the contracting parties upon themselves"); Leet v. Cellco Partnership, 480 F. Supp. 2d 422, 432 (D. Mass. 2007) ("Plaintiff's breach of contract claim is not preempted, as Verizon's

alleged contractual obligation to remove the negative information from plaintiff's credit report was not imposed by state law, but rather was imposed by Verizon itself when it entered into the September 2003 agreement.").  There is, however, a paucity of cases addressing the issue, and, based on the Court's initial survey, there does not appear to be unanimity amongst them.  See, e.g., Lloyd v. Midland Funding, LLC, No. 12-566, 2014 WL 3507363, at *11 (E.D. Tenn. July 14, 2014) (breach-of-contract claim preempted); Mendy v. JP Morgan Chase & Co., No. 12-8252, 2014 WL 1224549, at *6 (S.D.N.Y. Mar. 24, 2014) (holding that state-law claims, including breach of contract, were preempted to the extent they "fall within the subject matter regulated by the FCRA").

Despite the relative complexity of the issue, the parties provided the Court with little briefing on it.  As noted above, the Bank raised the argument for the first time in its Reply.  It did so in a single paragraph with no citations to any decision holding that breach-of-contract claims are preempted.  Although the Berlins provided a bit more discussion of the issue in their Sur-Reply, their analysis was still confined to little more than a page.  And, of course, the Court has not had the benefit of hearing BANA's response to the arguments Plaintiffs raised.  It will thus abstain from ruling on this issue until the parties have had a chance to brief it more fully.

In sum, Plaintiffs may proceed with their breach-of-contract claim for now.

C.  Count III: Breach of Implied Covenant of Good Faith

In Count III, the Berlins charge the Bank with breaching its duties of good faith and fair dealing.  Under District law, a covenant of good faith and fair dealing is implied in every contract.  See Brown, 774 F.3d at 1025 (citing Paul v. Howard Univ., 754 A.2d 297, 310 (D.C. 2000)).  "A party breaches this covenant if it 'evades the spirit of the contract, willfully renders imperfect performance, or interferes with performance by the other party' to the contract."  Id.

(quoting <u>Paul</u>, 754 A.2d at 310).  It commits no such breach, however, where "reasonable persons in the parties' shoes would have expected the contract to be performed as it was."  <u>Id.</u> (quoting <u>Adler v. Abramson</u>, 728 A.2d 86, 90-91 (D.C. 1999)) (internal quotation marks omitted).  Plaintiffs claiming a breach of the covenant "must allege either bad faith or conduct that is arbitrary or capricious."  <u>Rodriguez v. Laboratory Corp. of America Holdings</u>, 13 F. Supp. 3d 121, 134 (D.D.C. 2014) (quoting <u>Wright v. Howard Univ.</u>, 60 A.3d 749, 754 (D.C. 2013)) (internal quotation marks omitted).  As the D.C. Court of Appeals has noted, "'Subterfuges and evasions violate the obligation of good faith in performance . . . [b]ut the obligation goes further: bad faith may be overt or consist of inaction, and fair dealing may require more than honesty.'" <u>Sundberg v. TTR Realty, LLC</u>, No. 14-374, 2015 WL 858285, at *7 (D.C. Feb. 12, 2015) (quoting Restatement (Second) of Contracts, § 205).

Although BANA did not raise the issue, the Berlins note in their Opposition that under Virginia law, while there is a similar duty implied in every contract, <u>see, e.g.</u>, <u>Stoney Glen, LLC v. Southern Bank & Trust Co.</u>, 944 F. Supp. 2d 460, 465 (E.D. Va. 2013), breaches of that duty must be brought as breach-of-contract claims.  In other words, Virginia does not recognize a breach of such covenants as an independent cause of action separate from breach of contract. <u>See</u> <u>Charles E. Brauer Co., Inc. v. NationsBank of Va., N.A.</u>, 466 S.E.2d 382, 385 (1996); <u>Smith v. Flagstar Bank, F.S.B.</u>, No. 14-741, 2015 WL 1221270, at *6 (E.D. Va. Mar. 17, 2015).  To the extent, therefore, that Plaintiffs assert breaches of these covenants in connection with agreements controlled by Virginia law, those claims are subsumed in Count II.  <u>See, e.g.</u>, <u>Flagstar Bank</u>, 2015 WL 1221270, at *6 (citing <u>Jones v. Fulton Bank, N.A.</u>, No. 13-126, 2013 WL 3788428, at *7 (E.D. Va. July 18, 2013) ("Here, Plaintiff has attempted to assert a separate cause of action

for breach of the implied duty of good faith, and thus he has not stated a claim upon which relief may be granted under Virginia law."). With that, the Court turns to the parties' disputes.

      1. *Sufficiency of Allegations*

As with the breach-of-contract claim, the Court does not treat with each potential contract, as it finds that the Berlins have adequately stated a claim for breach of the covenant implied in the parties' later agreements whereby the Bank was to correct their loan documents and credit information. See Am. Compl., ¶¶ 21-22. The Amended Complaint shows that the Bank willfully rendered imperfect performance. As an example, although the Berlins repeatedly alerted BANA to remaining errors in its revised drafts of the loan documents, the Bank consistently ignored their warnings, demanded that they sign them anyways, and recorded them with errors yet again. See, e.g., id., ¶ 35(a). Despite the repeated problems correcting the loans, moreover, the Bank refused to provide any documentation that it had fixed the errors. See, e.g., id., ¶ 35(b)(6). Later, from January to June 2014, Plaintiffs tried contacting the Bank and its outside counsel at least nine times about ongoing deficiencies in the recorded documents, but they never received a response, and "upon information and belief, [the Bank] failed to take any corrective action." Id., ¶ 35(b)(7). These and other allegations in the Amended Complaint are enough to raise an inference that the Bank rendered imperfect performance.

It is also worth noting that Defendant appears to concede in its Motion that if the later agreements were valid contracts, Plaintiffs have stated a breach-of-covenant claim. See Mot. at 8 (arguing only that it did not breach the implied covenant in connection with the "alleged contracts relating to credit reporting and correcting the alleged deficiencies in the loan documents because, as stated above, no such contracts exist"). Since the Court has concluded to

the contrary, Defendant has not raised any viable argument against this claim in relation to these later contracts.

### 2. *FCRA Preemption*

Defendant again raises the FCRA preemption issue, though this time in only a single sentence. <u>See</u> Reply at 8. Plaintiffs' Sur-Reply did not respond separately, perhaps assuming that the same rationale for finding no preemption of a breach-of-contract claim would apply. It is not so obvious, however, that the Court should analyze the preemption of breach-of-contract claims and breach-of-implied-covenant claims in the same way. For instance, in <u>Carruthers v. Am. Honda Financial Corp.</u>, 717 F. Supp. 2d 1251 (N.D. Fla. 2010), a district court ruled that claims for breaches of <u>implied</u> warranties were preempted because, in contrast to express warranties or other contractual provisions, implied warranties are imposed by state law. <u>See</u> <u>id.</u> at 1255 ("The duty of good faith and fair dealing – like the implied warranty of merchantability – is implied by law, not voluntarily assumed."). In any future briefing on this topic, then, the parties should address the differences, if any, between the FCRA preemption analyses for Plaintiffs' different common-law claims.

### 3. *Statute of Limitations*

BANA also makes a last-minute argument in its Reply that this claim is barred by the statute of limitations. <u>See</u> Reply at 8. (For some reason, BANA did not interpose this defense as to Plaintiffs' contract count.) It states in support only that "Plaintiffs' claim is based on alleged breaches that happened more than three years before this action was initiated," with an "*e.g.*" cite to a single paragraph "discussing alleged misconduct from 2009 through 2011." <u>Id.</u> Plaintiffs retort that they have alleged "separate breaches . . . all causing them damages beginning in 2012, 2013, and 2014." Sur-Reply at 4. Although the paragraphs cited do not appear to allege new

actions breaching the parties' agreements, but instead only allege new injuries arising from those breaches, the Court will nonetheless decline to dismiss the claim as time-barred.

Under District of Columbia law, "[a] three-year statute of limitations applies to actions on a contract that is 'express or implied.'" Murray v. Wells Fargo Home Mortg., 953 A.2d 308, 321 (D.C. 2008) (citing D.C. Code § 12-301(7)). The statute of limitations is an affirmative defense, meaning plaintiffs need not show by their complaints that they can clear this hurdle. Courts, instead, will dismiss a claim on this ground only if it is clear from the face of a complaint that it is out of time. See, e.g., Potts v. Howard Univ. Hosp., 623 F. Supp. 2d 68, 71 (D.D.C. 2009) ("[T]he court should grant a motion to dismiss only if the complaint on its face is conclusively time-barred.") (citing Firestone v. Firestone, 76 F.3d 1205, 1209 (D.C. Cir. 1996)). Here, it is not clear when the cause of action accrued. Although it appears that the later agreements were formed in early 2010, Plaintiffs do not allege a specific date by which BANA was to perform or a date on which it allegedly breached the covenants related to those agreements. Because the chronology of these events does not plainly show the claim to be time-barred, the Court will not dismiss on this basis.

Even assuming, moreover, that three years has passed since BANA breached the agreements, the claim is not necessarily blocked. Under D.C. law, a defendant may be "estopped from asserting the statute of limitations as a bar to [a] plaintiff's action if he has done anything that would tend to lull the plaintiff into inaction and thereby permit the statutory limitation to run against him." Property 10-F, Inc. v. Pack & Process, Inc., 265 A.2d 290, 291 (D.C. 1970); see also, e.g., Bailey v. Greenberg, 516 A.2d 934, 940 (D.C. 1986). Although this is a difficult hurdle to clear, Plaintiffs' Amended Complaint is riddled with allegations suggesting that the Bank dragged out various processes and made it seem as though it was acting in good faith when

it was not.  Plaintiffs have alleged, for instance, that BANA repeatedly acknowledged its failures

to correct certain information, made promises that it would remedy the errors, and took various

steps that made it seem as though it would perform.  See, e.g., Am. Compl., ¶ 22 ("[O]n several

occasions, the Berlins received from BANA computer generated or personally crafted letters on

BANA stationary claiming that the corrections had been made, only to discover thereafter that

BANA continue[d] to provide the same inaccurate and misleading information to the CRAs.");

id., ¶ 35(a) ("From 2009 through late 2011, BANA prepared numerous loan modifications in an

attempt to correct the material and substantive errors in the Berlins' loan documents."); id., ¶

35(b)(6) (alleging that in December 2013, counsel for BANA acknowledged that there were still

errors in the loan documents and that "counsel planned to submit for corrections").  Plaintiffs

may yet be able to show that these actions reasonably lulled them into inaction and that BANA

should be estopped from asserting this defense.

    D.  Count IV: Fraudulent Misrepresentation

    Count IV accuses BANA of making fraudulent misrepresentations in its dealings with the

Berlins.  In D.C., "[i]n order to prove fraudulent misrepresentation, a plaintiff must prove '(1) a

false representation, (2) in reference to a material fact, (3) made with knowledge of its falsity, (4)

with the intent to deceive, and (5) action taken . . . in reliance upon the representation, (6) which

consequently resulted in provable damages.'"  Kumar v. Dist. of Columbia Water & Sewer

Auth., 25 A.3d 9, 15 n.9 (D.C. 2011) (quoting Railan, 766 A.2d at 1009).  Virginia's standard is

virtually identical.  See Flagstar Bank, 2015 WL 1221270, at *5 ("Under Virginia law, a claim

for actual fraud requires '(1) a false representation, (2) of material fact, (3) made intentionally or

knowingly, (4) with intent to mislead, [and] (5) reliance by the party misled, . . . (6) resulting [in]

damage to [that] party.'") (quoting <u>State Farm Mut. Auto. Ins. Co. v. Remley</u>, 618 S.E.2d 316,

321 (Va. 2005)) (alterations in original).

Defendant raises three arguments in seeking dismissal of this claim: (1) the Berlins have

not pled fraud with particularity, as required by Federal Rule of Civil Procedure 9(b); (2) their

allegations appear to "relate to future conduct, which is not actionable as a misrepresentation";

and (3) "to the extent [their] claim for fraudulent misrepresentation relates to remediat[ing]

and/or correct[ing] the Berlins' credit history, [the] claim is preempted by the FCRA." Mot. at

9-11 (internal quotation marks omitted, some alterations in original). The Court agrees with the

first and will, accordingly, dismiss this count, though without prejudice to Plaintiffs' seeking

leave to amend.

As the parties agree, the Federal Rules require that plaintiffs alleging fraud "must state

with particularity the circumstances constituting fraud . . . ." Fed. R. Civ. P. 9(b). "This rule

requires the claimant to specifically plead 'matters such as the time, place and content of the

false [representations], the misrepresented fact and what the opponent retained or the claimant

lost as a consequence of the alleged fraud.'" <u>Henok v. Chase Home Finance, LLC</u>, 922 F. Supp.

2d 110, 122 (D.D.C. 2013); <u>see also, e.g.</u>, <u>Feng v. Lim</u>, 786 F. Supp. 2d 96, 103 (D.D.C. 2011);

<u>Rodriguez</u>, 13 F. Supp. 3d at 129. In their Amended Complaint, the Berlins indiscriminately

dumped a truckload of allegations into single-spaced, multi-part paragraphs. Count IV then

referenced the alleged fraudulent statements in summary fashion, leaving it to the Court to sort

out the who, what, when, and where for these vaguely referenced misrepresentations. In their

Opposition, moreover, Plaintiffs discussed the purported misrepresentations in sweeping

statements and then cited to series of allegations, many of which were extremely vague. <u>See,</u>

<u>e.g.</u>, Am. Compl., ¶ 3(f). Some do not even clearly allege or seem to relate to any

misrepresentation of fact on which Plaintiffs could have relied.  See, e.g., id., ¶ 36 (alleging that

BANA sent letters to Plaintiffs misstating, among other things, that Plaintiffs sought federal

financial assistance for their loans or that they wanted to sell their property).

This simply will not do.  Particularly with allegations of fraud, which involve heightened

pleading standards, Plaintiffs must clearly specify the fraudulent statements for which they seek

relief.  As they have not yet done so, the Court will dismiss this count without prejudice.  If they

wish to proceed on this theory, Plaintiffs may amend their Complaint to make manifest what the

misrepresentations were, when they were made, and by whom.  In doing so, they must also

clearly state the actions they took in reliance on the Bank's false statements, as well as the

damages they suffered as a result.  This, of course, is not to say that they must allege "all facts

supporting each and every instance of fraud" since 2009, see Reply at 30, but they must do more.

For instance, one of the paragraphs they cite alleges, without reference to any particular time

period and without providing names of any individuals involved, that "BANA promised to

correct negative and misleading credit information . . . in emails, by telephone calls, by faxes, by

computer-generated letters, and by 'personally signed override letters' executed by officers of

the bank."  See Am. Compl., ¶ 3(d).  Allegations such as these, especially where it is difficult to

piece them together as a result of Plaintiffs' inartful pleading, are too vague.

In dismissing this claim, the Court offers one observation regarding BANA's remaining

arguments.  The Bank suggests that Plaintiffs cannot recover for misrepresentations about "'its

intent and ability to remediate and/or correct the Berlins' credit history and the recorded loan

documents and [its] intent to negotiate and resolve the issues underlying [P]laintiffs' loans'"

because those "relate to future conduct, which is not actionable as a misrepresentation."  Mot. at

9-10 (quoting Am. Compl., ¶ 79).  This is plainly wrong.  This Circuit has explained that

"[a]lthough an erroneous <u>forecast</u> of an event's future occurrence is not actionable in tort, where a promisor misrepresents his <u>present</u> intent to perform an act in the future, the promise may state a claim for tortious misrepresentation." <u>Chedick v. Nash</u>, 151 F.3d 1077, 1081 (D.C. Cir. 1998); <u>see also, e.g.</u>, <u>Bennett v. Kiggins</u>, 377 A.2d 57, 61 (D.C. 1977) ("When a person positively states that something is to be done or is to occur, when he knows the contrary to be true, the statement will support an action in fraud."); <u>Feng</u>, 786 F. Supp. 2d at 103 ("'[A]n allegation that a party falsely stated existing intentions is sufficient to state a claim for fraudulent misrepresentation.'") (quoting <u>Barnstead Broadcasting Corp. v. Offshore Broadcasting Corp.</u>, 886 F. Supp. 874, 883 (D.D.C. 1995)). If adequately re-pled, the Berlins may seek to recover for false statements that the Bank may have made about its intentions and abilities to take certain actions that it <u>knew</u> it would not and could not take, if they justifiably relied on those statements and incurred damages as a result.

    E.  <u>Count V: Negligent Misrepresentation</u>

    Count V asserts a cause of action for negligent misrepresentation. To prevail on such a claim under District law, "a plaintiff . . . must show '(1) that [the defendant] made a false statement or omitted a fact that he had a duty to disclose; (2) that it involved a material issue; and (3) that [the plaintiff] reasonably relied upon the false statement or omission to his detriment.'" <u>Sundberg</u>, 2015 WL 858285, at *5 (quoting <u>Kumar</u>, 25 A.3d at 15 n.9). Plaintiffs note in their Opposition that, "[w]hile Virginia does not recognize 'negligent misrepresentation,' it does recognize a claim for 'constructive fraud.'" Opp. at 34 n.15 (citing <u>Design & Prod., Inc. v. Am. Exhibitions, Inc.</u>, 820 F. Supp. 2d 727, 742-43 (E.D. Va. 2011)), the elements of which are similar. <u>See</u> <u>Design & Prod., Inc.</u>, 820 F. Supp. 2d at 742.

In its Motion, BANA raises a variety of challenges to the viability of this cause of action, including that: (1) Plaintiffs have not adequately alleged that the Bank owed a duty to Plaintiffs; (2) the claims essentially seek relief for breaches of contractual duties and cannot be pursued under a tort theory; (3) the economic-loss rule bars the Berlins from recovering under negligence; (4) to the extent the misrepresentations relate to correcting credit information, they are preempted by the FCRA; and (5) the doctrine of contributory negligence precludes Plaintiffs' recovery for misrepresentations about the loan-document errors because they were negligent in reviewing and signing them.  It is difficult to address these arguments given the lack of clarity in the Berlins' Amended Complaint about the bases for their negligent-misrepresentation claim. Just as with their fraud count, Plaintiffs' failure to more clearly delineate the misrepresentations for which they seek relief requires dismissal without prejudice.  Should the Berlins wish to amend their Complaint to include such a claim, the Court can address Defendant's arguments at that time with a clearer picture of Plaintiffs' theory.  For now, it notes only that Plaintiffs should make clear in any proposed amendment that they are also bringing a claim for constructive fraud under Virginia law.

 F. <u>Count VI: Violation of the Fair Credit Reporting Act</u>

The Berlins next assert claims under the Fair Credit Reporting Act, 15 U.S.C. § 1681 *et seq*.  In particular, they allege that BANA failed to take certain statutorily required actions after CRAs notified it that Plaintiffs disputed certain credit information it had furnished.  <u>See</u> Am. Compl., ¶ 100.  Those shortcomings included "[f]ailing to conduct a reasonable investigation with respect to the disputed information," "[f]ailing to report the results of its investigation to the CRAs," "[f]ailing to modify or permanently block the reporting of inaccurate information regarding Plaintiffs," and "[f]ailing to note on its subsequent reports to the CRAs that Plaintiffs

disputed the information reported." Id.  In its Motion, the Bank raises a bevy of challenges to both the sufficiency and timeliness of these claims.  Before explaining why none of these attacks succeeds, a brief overview of the relevant FCRA provisions is in order.

> 1. *FCRA Framework*

The FCRA was enacted "to ensure fair and accurate credit reporting, promote efficiency in the banking system, and protect consumer privacy." Safeco Ins. Co. of Am. v. Burr, 551 U.S. 47 (2007).  In addition to imposing duties on consumer reporting agencies, the Act "imposes some duties on the sources that provide credit information to CRAs." Gorman v. Wolpoff & Abramson, LLP, 584 F.3d 1147, 1153 (9th Cir. 2009).  More specifically, Section 1681s-2 imposes two sets of duties on "furnishers" of credit information.  (Neither party here disputes that BANA is a "furnisher" of such information for FCRA purposes.)  The first, laid out in subsection (a), governs their responsibilities to provide accurate information to CRAs in the first instance, to update and correct information that they later determine is incomplete or inaccurate, and to notify CRAs about information that a consumer has disputed.  See 15 U.S.C. § 1681s-2(a).  The second set of duties, detailed in subsection (b), is triggered once they receive notices of consumer disputes from CRAs.  See 15 U.S.C. § 1681s-2(b).  Specifically, if a consumer notifies a CRA that he disputes the accuracy of certain credit information, the CRA must inform the furnisher of the information about the dispute.  See 15 U.S.C. § 1681i(a)(2)).  After receiving such notice, the furnisher must:

> (a)     conduct an investigation with respect to the disputed information;
> (b)     review all relevant information provided by the [CRA] pursuant to section 1681i(a)(2) of this title;
> (c)     report the results of the investigation to the [CRA];
> (d)     if the investigation finds that the information is incomplete or inaccurate, report those results to all other [CRAs] to which the

person furnished the information and that compile and maintain files on consumers on a nationwide basis; and

(e)     if an item of information disputed by a consumer is found to be inaccurate or incomplete or cannot be verified after any reinvestigation . . . for purposes of reporting to a [CRA] only, as appropriate, based on the results of the reinvestigation promptly –

(i)     modify that item of information;

(ii)     delete that item of information; or

(iii)     permanently block the reporting of that item of information.

15 U.S.C. § 1681s-2(b)(1).

Sections 1681n and 1681o provide for private rights of action against those who willfully or negligently fail to comply with the FCRA's requirements. Yet, as both parties agree, the Act does not allow consumers to bring actions against furnishers for noncompliance with the first set of duties, § 1681s-2(a), instead leaving the enforcement of that provision to certain federal and state agencies and officials. See Mot. at 14; Opp. at 22; 15 U.S.C. § 1681s-2(c), (d); see also, e.g., Gorman, 584 F.3d at 1154; Saunders v. Branch Banking & Trust Co. of Va., 526 F.3d 142, 149 (4th Cir. 2008); Chiang v. Verizon New England Inc., 595 F.3d 26, 35 (1st Cir. 2010). The majority of courts has concluded, however, that private rights of action are available against furnishers who violate their duties under the second, § 1681s-2(b). See, e.g., Gorman, 584 F.3d at 1155; Saunders, 526 F.3d at 149; Chiang, 595 F.3d at 36; Boggio v. USAA Federal Sav. Bank, 696 F.3d 611, 618 (6th Cir. 2012); Mazza v. Verizon Washington DC, Inc., 852 F. Supp. 2d 28, 34 (D.D.C. 2012).

To make out a § 1681s-2(b) claim against a furnisher, a plaintiff must establish that: (1) he notified a CRA of a dispute related to his credit information; (2) the CRA then notified the furnisher of the information about the dispute; and (3) the furnisher failed to fulfill the obligations enumerated in § 1681s-2(b)(1). See Mazza, 852 F. Supp. 2d at 35. This framework now in mind, the Court will turn to Defendant's arguments.

2.  *Sufficiency of Allegations*

BANA first takes issue with the sufficiency of the Berlins' allegations, asserting that they have not sufficiently pled each required element.  See Mot. at 14.  It further points out that "[w]hile Plaintiffs do allege that they 'sent . . . credit remediation letters and the Stuart Street Loan Agreement . . . to the CRAs, which forwarded the dispute to [BANA],' they do not allege that these letters served as notification to the CRAs."  Id. (quoting Am. Compl., ¶ 25(g)).

The latter argument is easily dispatched.  The point of the letters was clearly notification; indeed, Plaintiffs allege in the same paragraph quoted by BANA that the CRAs thereafter "forwarded the dispute" to the Bank.  As to the former, the Court believes that the Berlins have adequately pled the FCRA claim.  As discussed previously, "detailed factual allegations" are not required to withstand a motion to dismiss under Rule 12(b)(6).  Twombly, 550 U.S. at 555. Rather, Plaintiffs need only provide "sufficient factual matter, [if] accepted as true, to state a claim to relief that is plausible on its face."  Iqbal, 556 U.S. at 678 (internal quotation omitted).

They have done just that.  After explaining that the Bank repeatedly furnished inaccurate credit information about certain of their loans – including reporting that their properties had been foreclosed upon – the Berlins allege that "BANA . . . failed to conduct a reasonable investigation in response to notices of disputes forwarded to it by each of the three major credit bureaus."  Am. Compl., ¶ 3(d).  Elsewhere, in broadly discussing the Bank's errors in reporting credit information about their loans, they state: "[W]hen BANA was notified by the CRAs of the disputed credit information, it failed to conduct a proper investigation as evidenced by its continued furnishing of the same inaccurate information."  Id., ¶ 23.  In relation to their discussion of the Stuart Street loan, moreover, the Berlins allege that after the Bank unsuccessfully "issued 'override letters' and 'final determination letters' in an attempt to stop

furnishing erroneous and misleading information to the CRAs," they "sent the credit remediation letters and the Stuart Street Loan Agreement with BANA to the CRAs, which forwarded the dispute to BANA," and that, "[i]n each case, BANA failed to conduct a proper investigation and continued to furnish inaccurate and misleading negative credit information to the CRAs." Id., ¶ 25(g). Several of their allegations also indicate that after receiving these notices and determining that the information was wrong, the Bank failed to modify and permanently block the reporting of it. See, e.g., id., ¶¶ 23, 25(i).

This is enough for now. The Court, of course, understands Defendant's frustration. The Amended Complaint provides excruciating detail about certain events, but is rather sparse when it comes to details about other seemingly more central issues, such as when Plaintiffs submitted notices of disputes to the CRAs or the number of disputes they raised. A complaint, however, need not provide every detail, and the Bank will have ample opportunity during discovery to flesh out the precise notices of dispute pursuant to which the Berlins claim that it failed to take required action.

### 3. *Actionable Conduct*

BANA challenges certain of the alleged FCRA violations on the ground that they implicate its duties under § 1681s-2(a) and thus cannot be enforced in this private action. It contends, for instance, that Plaintiffs' allegation that it "'knew or should have known it was reporting false information regarding the Berlins" states a violation of subsection (a), not (b). See Mot. at 17 (quoting Am. Compl., ¶ 99). It makes a similar point regarding their allegation that "BANA's failure to correct the inherent problems in [its software system] . . . represents a separate and continuing violation of FCRA." Am. Compl., ¶ 103; see Mot. at 17. To the extent that Plaintiffs' inclusion of these allegations in Count VI may be read as seeking relief for

Defendant's <u>furnishing</u> of inaccurate information to CRAs in the first instance, the Bank is correct that they cannot bring such a claim. Both statements, however, may also be fairly read to relate to the Bank's disregard of its obligations under (b), such as its duty to "modify," "delete" or "permanently block" information that its post-notice investigation found incomplete or inaccurate. <u>See</u> 15 U.S.C. § 1681s-2(b)(1)(E). Those are certainly proper bases for a private suit against BANA.

Defendant next takes issue with Plaintiffs' asserting as a basis for their FCRA claim that the Bank "'failed to note on its subsequent reports to the CRAs that Plaintiffs disputed the information reported.'" Mot. at 16 (quoting Am. Compl., ¶ 100(h)). It argues that "[t]he duty to provide notice of a dispute is set forth at § 1681s-2(a)(3)," meaning that there is "no private right of action for this alleged conduct." <u>Id.</u> at 16-17 (quoting Am. Compl., ¶ 100(h)) (alterations omitted). Several courts, however, have found that although private plaintiffs may not challenge a furnisher's <u>initial</u> failure to report information as disputed, as required by § 1681s-2(a)(3), they may challenge a furnisher's failure to report it after it has received notice of a dispute in accordance with § 1681s-2(b), if the absence of such a notation would render the information materially misleading. In <u>Saunders</u>, for instance, the Fourth Circuit ruled that a furnisher's failure to update its information to report a consumer dispute after receiving notice of a dispute from a CRA could violate § 1681s-2(b) when failing to do so would render the furnished credit information inaccurate or incomplete. <u>See</u> 526 F.3d at 149. It explained: "No court has ever suggested that a furnisher can excuse its failure to identify an inaccuracy when reporting pursuant to § 1681s-2(b) by arguing that it should have <u>already</u> reported the information accurately under § 1681s-2(a)." <u>Id.</u> at 149-50 (emphasis in original). Other courts have, likewise, permitted private plaintiffs to pursue such claims. <u>See, e.g.</u>, <u>Gorman</u>, 584 F.3d at 1162-

64; Llewellyn v. Allstate Home Loans, Inc., 711 F.3d 1173, 1186 (10th Cir. 2013).  Although the reasoning of these cases appears persuasive, the Court need not resolve the issue definitively now because BANA's failure to report information as disputed following its investigations does not serve as the sole basis for Plaintiffs' FCRA claim.

### 4.  *Contradictory Statements*

The Bank next suggests that Plaintiffs' own assertions belie their allegations that it failed to conduct reasonable investigations in response to notices of disputes.  See Mot. at 14.  It points out that the Berlins have alleged that it "repeatedly issued signed correction and remediation credit letters . . . directing the credit bureaus to remove the negative information," "[b]ut each of these letters were [*sic*] later overridden by BANA's own broken internal processes, which prevented anyone from suppressing the [software] system from subsequently furnishing inaccurate and misleading negative information about the Berlins."  Id. at 15 (quoting Am. Compl., ¶ 35(h)(1)) (internal quotation marks omitted).  According to BANA, "These allegations show that [it] did investigate Plaintiffs' claims and took action to address the issue."  Id.  Yet, as Plaintiffs respond, the very allegations from which BANA quotes indicate that it failed to fulfill at least some of its obligations – *viz.*, to modify, delete, or permanently block the reporting of information that, upon investigation, it found to be incomplete or inaccurate.  See Opp. at 25.

### 5.  *Statute of Limitations*

Finally, BANA argues that Plaintiffs' FCRA claims are untimely.  See Mot. at 15-16. Under the Act, "[a]n action to enforce any liability" must be brought "not later than the earlier of (1) 2 years after the date of discovery by the plaintiff of the violation that is the basis for such liability; or (2) 5 years after the date on which the violation that is the basis for such liability occurs."  15 U.S.C. § 1681p.  The Bank stresses that the Berlins are required to "show that they

notified the CRAs of the dispute, that the CRAs provided notice to BANA, and that BANA failed to investigate the dispute – all within the required statute of limitations." Reply at 10 (emphasis added). They argue that the only FCRA claim pled with any specificity accrued sometime between April 2010 and 2011, and that Plaintiffs' have otherwise "failed to adequately allege when each such purported violation occurred." Mot. at 16.

Although BANA is correct that Plaintiffs have largely failed to put any timeframe on when they initiated disputes with the CRAs or when the Bank violated its duties under the statute, the Court cannot say from the face of the Amended Complaint that they are out of time. Because the statute of limitations is an affirmative defense, see, e.g., Mazza, 852 F. Supp. 2d at 37 n.5 (finding that plaintiff plead FCRA violation within previous two years but that, in any event, court was "not to dismiss a case on statute of limitations grounds unless it is clear from the Complaint that it is conclusively time-barred"); Rogers v. Johnson-Norman, 466 F. Supp. 2d 162, 176 (D.D.C. 2006) (explaining that on a motion to dismiss, court could not dismiss FCRA claim as time-barred because it was not clearly so), the Court does not believe dismissal is warranted at this juncture.

G.  Count VII: Promissory Estoppel

The Berlins last bring a claim for promissory estoppel. In briefing, they acknowledge that although BANA did not raise the issue, Virginia law does not recognize such a cause of action, and that they, therefore, "confine their promissory estoppel claims to the E Street Loan." Opp. at 17 n.7 (citing Mongold v. Woods, 278 Va. 196, 202-03 (2009)).

In the District, "[p]romissory estoppel provides a party with a remedy to enforce a promise where the formal requirements of a contract," such as consideration, "have not been satisfied." Vila v. Inter-American Investment, Corp., 570 F.3d 274, 279 (D.C. Cir. 2009) (citing

Bender v. Design Store Corp., 404 A.2d 194, 196 (D.C. 1979)).  That is, in the absence of a valid

contract, "courts will, in some circumstances, enforce the promise where the promisee has

detrimentally relied."  Id.  "In order to find a party liable on a theory of promissory estoppel,

there must be evidence of a promise, the promise must reasonably induce reliance upon it, and

the promise must be relied upon to the detriment of the promisee."  Simard v. Resolution Trust

Corp., 639 A.2d 540, 552 (D.C. 1994) (citing Bender, 404 A.2d at 196).  Courts are "not [to]

give effect to reliance on a promise 'unless necessary to avoid injustice.'"  Vila, 570 F.3d at 282

(quoting Granfield v. Catholic Univ. of America, 530 F.2d 1035, 1041 (D.C. Cir. 1976)).

      The Berlins have adequately pled this cause of action.  In their Amended Complaint, they

allege that the Bank promised, among other things, to "correct all of the errors in the loan

documents, correct inaccurate and misleading information it had furnished to the CRAs, and

cease reporting inaccurate and misleading information to the CRAs," and that it "made these

promises with the intent that Plaintiffs would rely on them."  Am. Compl., ¶¶ 110-11.  They, in

fact, "did rely on these promises to their detriment, by, among other things, making payments to

BANA and engaging counsel to represent them before the bank."  Id., ¶ 112.  As pointed out in

their Opposition, they took other steps as a result of these assurances, including "continuing to

escrow payments, providing BANA with requested documentation, [and] negotiating with

BANA in good faith . . . ."  Opp. at 15; see also, e.g., Am. Compl., ¶¶ 32-35.  Should the alleged

contracts fail to satisfy the necessary elements of a valid, enforceable contract – e.g.,

consideration or sufficiently definite terms – the Berlins may thus still be able to seek relief

under a theory of promissory estoppel.  See, e.g., Osseiran v. Int'l Finance Corp., 498 F. Supp.

2d 139, 148 (D.D.C. 2007).  Although the Court harbors some doubts that the Berlins' reliance

attributable to the Bank's later promises was detrimental enough to warrant invocation of the

Court's equitable powers to enforce those promises, it is also not yet prepared to rule definitively that it is not. This is especially so where BANA did not bother to discuss several of the purported ways in which the Berlins detrimentally relied or to engage in any discussion of relevant case law.

As discussed previously, Plaintiffs' promissory-estoppel and breach-of-contract claims can also proceed at the same time. <u>See</u> Section III.B.4, *supra*. Finally, the Court notes that although BANA did not clearly assert a preemption defense in response to the Berlins' promissory-estoppel claim, it stated in response to their breach-of-contract claim that "[a]ll state law causes of action . . . are preempted by the FCRA." Reply at 5. At least some other courts have found promissory-estoppel claims preempted. <u>See, e.g.</u>, <u>Ihebereme v. Capital One, N.A.</u>, 933 F. Supp. 2d 86, 98 (D.D.C. 2013) (holding promissory-estoppel claim preempted to the extent it "ar[o]se from the contention that defendants provided false information to credit agencies or failed to correct false information they provided to credit agencies"). As the Court mentioned previously, however, the parties gave short shrift to the FCRA preemption issue, especially as it relates to the different state-law claims in this case. The Court will thus withhold a decision on whether promissory estoppel is preempted by the FCRA insofar as it relates to BANA's promises to correct inaccurate credit information until the parties have had an opportunity to address it at greater length.

**IV.    Conclusion**

For the foregoing reasons, the Court will grant in part and deny in part Defendant's

Motion to Dismiss Plaintiffs' Amended Complaint.   A contemporaneous Order will so state.

*/s/ James E. Boasberg*
JAMES E. BOASBERG
United States District Judge

Date:  April 24, 2015